IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 4, 2004 Session

# DONNA DENTON, ET AL. V. JOHN HAHN, ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 01C-1531     Barbara Haynes, Judge**

---

**No. M2003-00342-COA-R3-CV - Filed September 16, 2004**

---

This appeal involves a tenant who was injured when she slipped on the metal threshold of a rented condominium unit. The tenant and her husband filed a negligence action in the Circuit Court for Davidson County against both the owner of the condominium unit and the homeowners' association. The trial court granted the condominium owner's and the homeowners' association's motions for summary judgment, and the tenant and her husband have appealed. We have determined that the owner of the condominium unit was not responsible for the maintenance and repair of the metal threshold because it was part of the condominium's common elements. While the homeowners' association had a duty to maintain the threshold in a reasonably safe condition, we have determined that the association is not liable to the tenant and her husband as a matter of law because they failed to present evidence that the association had actual or constructive notice of the condition that caused the tenant's fall.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

WILLIAM C. KOCH, JR., P.J., M.S., delivered the opinion of the court, in which WILLIAM B. CAIN, J., joined. PATRICIA J. COTTRELL, J., filed a concurring opinion.

Ronald L. Stone, Nashville, Tennessee, for the appellants, Donna Denton and Robert Denton.

James L. Weatherly and Joseph T. Howell, Nashville, Tennessee, for the appellee, John Hahn.

Darrell G. Townsend and Neil M. McIntire, Nashville, Tennessee, for the appellee, Kingswood Homeowners' Association.

## OPINION

### I.

In 1979, Donna and Robert Denton moved into a rental apartment complex now called the Kingswood Condominiums. Approximately five years after they moved in, the rental apartments were converted to condominium units. The Dentons opted not to purchase their unit but continued to live there as tenants of the subsequent owners. At first the Dentons signed written lease

agreements with the owner of the condominium unit but later became month-to-month tenants with no written lease agreement between them and the owner of the unit.

Between 1979 and 2000, Mr. Denton was self-employed and later worked as a security guard. Ms. Denton worked for various companies until 1988 when she became totally disabled following an employment-related back injury that eventually required fusing two vertebrae in her lower back. She has not worked since 1988 and receives Social Security disability income.

In approximately 1988, the Dentons and other residents in the condominium complex began to notice that the buildings were settling. They observed (1) kitchen floors sinking in the middle, (2) other sloping floors, and (3) small gaps on the interior and exterior sides of the metal threshold leading to their patio. These conditions were generally known by the persons living in the condominium units, the homeowners' association, and Ghertner & Company, the financial manager of the condominium complex. All these conditions existed in October 1997 when Robert Hahn purchased the unit in which the Dentons were living.

Prior to the incident involved in this case, there had been three mishaps in the Dentons' unit involving the metal threshold. The first involved a guest who tripped over the threshold as she was leaving. The Dentons did not report this incident because the guest was not injured. The second incident occurred in 1998 when another guest tripped when she caught her heel on the threshold as she was leaving. This guest cut her arm severely when the storm door handle she grabbed to break her fall tore away from the storm door. The Dentons reported this incident to the homeowners' association and Mr. Hahn, and the association's maintenance employee repaired the storm door. The third incident involved Mr. Denton himself. Sometime prior to 2000, Mr. Denton slipped on the metal threshold when he stepped on it in his stocking feet. He did not report this incident because he was able to catch himself before he fell. The Dentons did not pursue the condition of the threshold with either Mr. Hahn or the homeowners' association after the 1998 incident.

On May 27, 2000, Ms. Denton, who was then recovering from abdominal surgery, fell as she was leaving the unit and injured her back, knee, and shoulder. When conservative therapy did not alleviate her back pain, Ms. Denton was required to undergo additional spinal surgery to fuse two other vertebrae in her lower back. Ms. Denton may also be required to undergo additional shoulder surgery to repair a rotator cuff that was torn when she fell.

On May 22, 2001, the Dentons filed a negligence action in the Circuit Court for Davidson County against Mr. Hahn, the Kingswood Homeowners' Association, and Ghertner & Company.[1] They alleged that Ms. Denton was injured when she "got her heel caught on the threshhold [sic] and/or in the gap between the threshhold [sic] and the concrete step." All defendants filed answers denying liability. When Ms. Denton was deposed in February 2002, she explained that she had not, in fact, tripped over the threshold in the sense that her toe hit the threshold and that she had not caught her heel in the gap adjacent to the threshold. Rather, she stated that she had stepped directly on the threshold and that her heel had slipped out from under her because the threshold was slanted down toward the outside.

---

[1]The Dentons eventually voluntarily dismissed their claims against Ghertner & Company.

On May 10, 2002, the homeowners' association filed a motion for summary judgment asserting that it did not own and was not responsible for the metal threshold. It also asserted, in the alternative, that it did not have actual or constructive notice of the specific characteristic of the threshold that caused Ms. Denton to fall, and that the Dentons' knowledge of the condition was equal or superior to its own. On the same day, Mr. Hahn filed a motion for summary judgment asserting that he was not liable because the undisputed facts demonstrated that the Dentons' knowledge of the allegedly dangerous condition was equal to or greater than his own.

The trial court heard both summary judgment motions on June 28, 2002, and shortly thereafter filed an order denying both motions without explanation. This order prompted both the homeowners' association and Mr. Hahn to file Tenn. R. Civ. P. 59.04 motions to alter or amend. The thrust of the homeowners' association's motion was to place the liability entirely on Mr. Hahn by insisting that maintaining the threshold in a safe condition was his responsibility. Mr. Hahn asserted that the question of ownership of the threshold was not material to his defense which was based on the undisputed fact that the Dentons knew as much as, if not more than, he did about the allegedly dangerous condition. The trial court heard these motions on September 27, 2002. On October 11, 2003, the trial court filed an order granting the Tenn. R. Civ. P. 59.04 motions as well as both defendants' motions to dismiss.

The Dentons responded by filing a Tenn. R. Civ. P. 59.04 motion to alter or amend. This motion, referencing the trial court's comments during the September 27, 2002 hearing, took issue with the court's conclusion that the threshold belonged to Mr. Hahn. They asserted that the condominium's master deed established as a matter of law that the threshold was a common element and that the responsibility for maintaining and repairing the threshold was with the homeowners' association. Following another hearing on December 13, 2002, the trial court filed an order on January 7, 2003 denying the Dentons' motion to alter or amend. This appeal ensued.

## II.
### THE STANDARD OF REVIEW

The standards for reviewing summary judgments on appeal are well settled. Summary judgments are proper in virtually any civil case that can be resolved on the basis of legal issues alone. *Fruge v. Doe*, 952 S.W.2d 408, 410 (Tenn. 1997); *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993); *Pendleton v. Mills*, 73 S.W.3d 115, 121 (Tenn. Ct. App. 2001). They are not, however, appropriate when genuine disputes regarding material facts exist. Tenn. R. Civ. P. 56.04. Thus, a summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion – that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001).

The party seeking a summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists and that it is entitled to a judgment as a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002); *Shadrick v. Coker*, 963 S.W.2d 726, 731 (Tenn. 1998). To be entitled to a judgment as a matter of law, the moving party must either affirmatively negate an essential element of the non-moving party's claim or establish an affirmative defense that

conclusively defeats the non-moving party's claim. *Staples v. CBL & Assocs.*, 15 S.W.3d 83, 88 (Tenn. 2000); *Cherry v. Williams*, 36 S.W.3d 78, 82-83 (Tenn. Ct. App. 2000).

Once the moving party demonstrates that it has satisfied Tenn. R. Civ. P. 56's requirements, the non-moving party must demonstrate how these requirements have not been satisfied. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Mere conclusory generalizations will not suffice. *Cawood v. Davis*, 680 S.W.2d 795, 796-97 (Tenn. Ct. App. 1984). The non-moving party must convince the trial court that there are sufficient factual disputes to warrant a trial (1) by pointing to evidence either overlooked or ignored by the moving party that creates a factual dispute, (2) by rehabilitating evidence challenged by the moving party, (3) by producing additional evidence that creates a material factual dispute, or (4) by submitting an affidavit in accordance with Tenn. R. Civ. P. 56.07 requesting additional time for discovery. *McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Byrd v. Hall*, 847 S.W.2d at 215 n.6. A non-moving party who fails to carry its burden faces summary dismissal of the challenged claim because, as our courts have repeatedly observed, the "failure of proof concerning an essential element of the cause of action necessarily renders all other facts immaterial." *Alexander v. Memphis Individual Practice Ass'n*, 870 S.W.2d 278, 280 (Tenn. 1993).

A summary judgment is not appropriate when a case's determinative facts are in dispute. However, for a question of fact to exist, reasonable minds must be able to differ over whether some alleged occurrence or event did or did not happen. *Conatser v. Clarksville Coca-Cola Bottling Co.*, 920 S.W.2d 646, 647 (Tenn. 1995); *Harrison v. Southern Ry. Co.*, 31 Tenn. App. 377, 387, 215 S.W.2d 31, 35 (1948). If reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists. *Louis Dreyfus Corp. v. Austin Co.*, 868 S.W.2d 649, 656 (Tenn. Ct. App. 1993). If, on the other hand, the evidence and the inferences reasonably drawn from the evidence would permit a reasonable person to reach only one conclusion, then there are no material factual disputes, and the question can be disposed of as a matter of law. *Godfrey v. Ruiz*, 90 S.W.3d at 695; *Seavers v. Methodist Med. Ctr.*, 9 S.W.3d 86, 91 (Tenn. 1999); *Beaudreau v. General Motors Acceptance Corp.*, 118 S.W.3d 700, 703 (Tenn. Ct. App. 2003).

Summary judgments enjoy no presumption of correctness on appeal. *BellSouth Adver. & Publ'g Co. v. Johnson*, 100 S.W.3d 202, 205 (Tenn. 2003); *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 285 (Tenn. 2001). Accordingly, appellate courts must make a fresh determination that the requirements of Tenn. R. Civ. P. 56 have been satisfied. *Hunter v. Brown*, 955 S.W.2d 49, 50-51 (Tenn. 1997). We must consider the evidence in the light most favorable to the non-moving party, and we must resolve all inferences in the non-moving party's favor. *Godfrey v. Ruiz*, 90 S.W.3d at 695; *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001). When reviewing the evidence, we must determine first whether factual disputes exist. If a factual dispute exists, we must then determine whether the fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial. *Byrd v. Hall*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998).

# III.
## A PROPERTY OWNER'S LIABILITY FOR DANGEROUS CONDITIONS ON PREMISES UNDER ITS CONTROL

Historically, a lease transaction was considered to be a conveyance of an interest in real property. *Tedder v. Raskin*, 728 S.W.2d 343, 346 (Tenn. Ct. App. 1987); *Helton v. Reynolds*, 640 S.W.2d 5, 8 (Tenn. Ct. App. 1982).[2]  For the term of the lease, the tenant not only acquired the exclusive right to control and use the property but also assumed all the obligations and liabilities of the property owner.  RESTATEMENT (SECOND) OF TORTS § 356 cmt. a (1965).  Accordingly, the common-law doctrine of caveat lessee made the tenant, rather than the landlord, liable for injuries to the tenant or others caused by dangerous conditions on the leased property. 5 FOWLER V. HARPER, ET AL., THE LAW OF TORTS § 27.16, at 271 (2d ed. 1986).

The Tennessee Supreme Court was among the first courts in the nation to recognize the harshness of the doctrine of caveat lessee and to use ordinary negligence principles to allocate the liability for dangerous conditions on leased property between the landlord and the tenant.[3]  The Court took this step in two companion cases arising from the collapse of a back porch on a Nashville boarding house in 1892.  *Hines v. Willcox*, 96 Tenn. 148, 33 S.W. 914 (1896) ("*Hines I*"); *Stenberg v. Willcox*, 96 Tenn. 163, 33 S.W. 917 (1896).  The porch was unsafe because of faulty construction and age when the property owner rented the house to a married couple who planned to operate it as a boarding house.  *Hines I*, 96 Tenn. at 150, 33 S.W. at 914; *Stenberg v. Willcox*, 96 Tenn. at 166, 33 S.W. at 917.

The tenant and one of her boarders, who were injured when the porch collapsed, sought to recover damages from the property owner based on (1) the owner's oral promise to repair the porch and representations that the porch was safe before the lease was signed and (2) the claim that the owner knew of the dangerous condition of the porch but concealed it.  *Hines I*, 96 Tenn. at 150, 33 S.W. at 915; *Stenberg v. Willcox*, 96 Tenn. at 164, 33 S.W. at 917.  The juries in both cases returned verdicts in favor of the defendant after the trial court refused to permit the tenant and her boarder to introduce evidence regarding the owner's oral promises to make the premises safe and representations that the premises had been repaired.  *Hines I*, 96 Tenn. at 150, 152, 33 S.W. at 914; *Stenberg v. Willcox*, 96 Tenn. at 163-64, 33 S.W. at 914.  The trial court had also instructed the jury that the owner could not be liable for any dangerous condition on the leased premises existing when the lease was signed unless the owner had actual knowledge of the condition.  *Hines I*, 96 Tenn. at 160, 33 S.W. at 916; *Stenberg v. Willcox*, 96 Tenn. at 164, 33 S.W. at 917.

The Tennessee Supreme Court reversed the judgments and granted new trials after concluding that the trial court erred in both cases by excluding the evidence regarding the owner's oral promises and representations regarding the condition of the house before the lease was signed.

---

[2]Some commentators believe that the concept of a lease as a conveyance will soon become obsolete.  *See, e.g.*, 1 MILTON R. FRIEDMAN, FRIEDMAN ON LEASES § 10.101, at 609-10 (4th ed. 1997) ("FRIEDMAN ON LEASES").

[3]The New Hampshire Supreme Court has identified the Tennessee Supreme Court as one of the first courts to use ordinary principles of tort liability to limit a landlord's broad, common-law immunity from liability for dangerous conditions on leased property.  *Sargent v. Ross*, 308 A.2d 528, 531 (N.H. 1973).

*Hines I*, 96 Tenn. at 158-60, 162, 33 S.W. at 916-17; *Stenberg v. Willcox*, 96 Tenn. at 164, 174, 33 S.W. at 917, 919.  Because of the prospect that the cases would be retried, the Court also determined that the trial court's instruction regarding the property owner's liability was too narrow.  In both the tenant's case and the boarder's case, the Court determined that the "great weight of authority" imposes liability on landowners who lease premises in a dangerous and unsafe condition when they knew, or should have known, of the condition and when the tenant did not know and could not reasonably have discovered the condition.  *Hines I*, 96 Tenn. at 160, 33 S.W. at 916; *see also, Stenberg v. Willcox*, 96 Tenn. at 164, 33 S.W. at 917.

The Tennessee Supreme Court's articulation of the property owner's standard of care prompted a vigorous petition to rehear both cases.  *Hines v. Willcox*, 96 Tenn. 328, 34 S.W. 420 (Tenn. 1896) ("*Hines II*").  The property owner asserted (1) that he should be held liable only for the conditions he actually knew about and (2) that he should not be liable to the tenant's boarders because the boarders' contract was with the tenant, not with him.  *Hines II*, 96 Tenn. at 329, 331, 34 S.W. at 420-21.  In its opinion denying the petition, the Court stated that the property owner's liability is based "upon the obligation the landlord or landowner is under to his tenant, as well as third persons, not to expose them to danger which he knows, or could know, by the exercise of reasonable diligence."  *Hines II*, 96 Tenn. at 330-31, 34 S.W. at 421.

On remand, the jury in the case brought by the tenant returned a $2,300 verdict in favor of the tenant, which was reduced to $1,800 on remittitur.  This time, the property owner appealed, asserting that the rule of landlord's liability announced in *Hines I*, *Stenberg v. Willcox*, and *Hines II* was "not supported by authority" and that the "true rule" applicable to "ordinary cases of rental" was the doctrine of caveat lessee.  *Willcox v. Hines*, 100 Tenn. 538, 540, 46 S.W. 297, 297 (1898) ("*Hines III*").  The Tennessee Supreme Court adhered to its articulation of a landlord's liability in *Hines I*, *Stenberg v. Willcox*, and *Hines II*.  After pointedly paraphrasing the property owner's argument,[4] the Court distinguished between a landlord's contract and tort liabilities and then explained: "The ground of liability upon the part of a landlord when he demises dangerous property has nothing special to do with the relation of landlord and tenant.  It is the ordinary case of liability for personal misfeasance, which runs through all the relations of individuals to each other."  *Hines III*, 100 Tenn. at 549, 46 S.W. at 299.  So began the demise of the doctrine of caveat lessee in Tennessee.

As a practical matter, the scope of the doctrine of caveat lessee, especially as it applies to residential leases, has been substantially narrowed by judicially recognized exceptions to the doctrine

---

[4]The Court stated:

> The logic of [the property owner's] position is that a landlord is under no obligation to know anything about the condition of his premises, whether they are dangerous or safe, whether habitable or a nuisance, and so long as he keeps himself ignorant, either intentionally or negligently, he cannot be held liable for any damages resulting from the dangerous condition of his property when leased.

*Hines III*, 100 Tenn. at 547, 46 S.W. at 299.

and by legislatively enacted limitations.[5] The four most common of these exceptions have been recognized by the Tennessee Supreme Court. The first exception involves dangerous conditions on the premises existing at the time of the lease when the landlord has actual or constructive notice of the condition and the tenant does not.[6] The second exception involves dangerous conditions caused either by the landlord's failure to make repairs it has a duty to make or the landlord's negligence in performing repairs, regardless of whether it had a duty to make the repairs.[7] The third exception involves the dangerous conditions on portions of property over which the landlord has retained control.[8] The fourth exception involves dangerous conditions on property leased for purposes involving the admission of the public.[9]

In addition to these exceptions, state and local legislative bodies have shifted liability for dangerous conditions on leased property from the tenant to the landlord. This court has imposed liability on a landlord for a dangerous condition existing when a lease was signed based on a city housing ordinance that imposed on landlords a duty not to lease a dwelling until the dwelling complied with the requirements of the housing code. *Smith v. Owen*, 841 S.W.2d 828, 831 (Tenn. Ct. App. 1992). Likewise, the Tennessee General Assembly has imposed on landlords in Davidson County and other parts of the state, the obligations to comply with the requirements of the building and housing codes affecting health and safety, to make all repairs necessary to put and keep the premises in fit and habitable condition, and to keep all common areas of the premises in a clean and safe condition. Tenn. Code Ann. § 66-28-304(a)(1)-(3) (1993).

Despite these legislative and judicial inroads into the caveat lessee doctrine, property owners are not liable for all dangerous conditions on leased property. They are not, for example, liable for dangerous conditions caused or created by a tenant on the portion of the premises under the tenant's exclusive control. Likewise, they are not liable for injuries caused by dangerous conditions on portions of the premises over which they retain control when they did not have actual or constructive notice of the condition within sufficient time to repair the condition or to provide warnings of the condition to others. *Basily v. Rain, Inc.*, 29 S.W.3d 879, 883-84 (Tenn. Ct. App. 2000).

---

[5]*See e.g.*, *Crawford v. Buckner*, 839 S.W.2d 754, 758-60 (Tenn. 1992) (invalidating exculpatory clauses in residential leases).

[6]*Hines I*, 96 Tenn. at 160, 33 S.W. at 916; *Stenberg v. Willcox*, 96 Tenn. at 164, 33 S.W. at 917. *Lethcoe v. Holden*, 31 S.W.3d 254, 256 (Tenn. Ct. App. 2000); *Maxwell v. Davco Corp.*, 776 S.W.2d 528, 531-32 (Tenn. Ct. App. 1989); Restatement (Second) of Torts § 358 (1965).

[7]*Ghormley v. Carl B. Cook, Inc.*, 756 S.W.2d 264, 267 (Tenn. Ct. App. 1988); *Tedder v. Raskin*, 728 S.W.2d at 346; Restatement (Second) of Torts §§ 357, 362 (1965).

[8]*Lethcoe v. Holden*, 31 S.W.3d at 258; *Tedder v. Raskin*, 728 S.W.2d at 347-48; Restatement (Second) of Torts §§ 360, 361 (1965).

[9]*See Beaman v. Grooms*, 138 Tenn. 320, 325, 197 S.W. 1090, 1091 (1917); *Hines III*, 100 Tenn. at 558-59, 46 S.W. at 320; *Kingsul Theatres, Inc. v. Quillen*, 29 Tenn. App. 248, 254, 196 S.W.2d 316, 319 (1946); Restatement (Second) of Torts § 359 (1965); FRIEDMAN ON LEASES § 10.105, at 662.

In summary, property owners and landlords are not insurers of the safety of the common elements under their control. *Tedder v. Raskin*, 728 S.W.2d at 348. While they have a duty to keep these areas in good repair and safe condition, *Woods v. Forest Hill Cemetery, Inc.*, 183 Tenn. 413, 424, 192 S.W.2d 987, 991 (1946); *Grizzell v. Foxx*, 48 Tenn. App. 462, 467-68, 348 S.W.2d 815, 817 (1960); *Jones v. Metro Elevator Co.*, No. W2000-02002-COA-R3-CV, 2001 WL 1683782, at *4 (Tenn. Ct. App. Dec. 31, 2001) (No Tenn. R. App. P. 11 application filed), they are not required to constantly inspect and repair the property. *Glassman v. Martin*, 196 Tenn. 595, 597, 269 S.W.2d 908, 909 (1954); *Tedder v. Raskin*, 728 S.W.2d at 348. Rather, property owners and landlords, like tenants, have a duty to exercise ordinary care with regard to the condition of the common areas under their control. *Tedder v. Raskin*, 728 S.W.2d at 347-48.

The negligence principles governing the liability of property owners and landlords for dangerous conditions on property under their control apply to condominiums. RESTATEMENT (SECOND) OF PROPERTY: LANDLORD & TENANT pt. VI, introductory note, at 154 (1977). The common areas of a condominium are collectively owned by the unit owners as tenants in common in proportion to their respective individual interests. Associations of unit owners generally perform all the business functions that rest on the landlord's shoulders in a traditional landlord-tenant relationship, *Frances T. v. Village Green Owners Ass'n*, 723 P.2d 573, 577 (Cal. 1986), including the control and maintenance of the common areas. *Martinez v. Woodmar IV Condos. Homeowners Ass'n*, 941 P.2d 218, 221 (Ariz. 1997). Accordingly, the duty of condominium owners associations to maintain the common areas in good repair and safe condition is analogous to the duty of landlords regarding the property under their control. *Frances T. v. Village Green Owners Ass'n*, 723 P.2d at 578; *Sevigny v. Dibble Hollow Condo. Ass'n*, 819 A.2d 844, 855 (Conn. App. Ct. 2003); *Trailside Townhome Ass'n v. Acierno*, 880 P.2d 1197, 1203 (Colo. 1994); *Smolek v. K.W. Landscaping*, 639 N.E.2d 974, 977 (Ill. App. Ct. 1994).

**IV.**

**THE CONTROL OF THE PREMISES WHERE MS. DENTON FELL**

Liability in cases like this one follows the right to control of the premises. Accordingly, the necessary first step in this case is to determine who had the right to control the metal threshold between the apartment and the patio where Ms. Denton fell. The homeowners' association insists that the threshold was part of Mr. Hahn's unit and, therefore, that it had no duty to maintain the metal threshold in good repair and safe condition. For the purpose of his summary judgment motion, Mr. Hahn conceded ownership but asserted that he is not liable because the Dentons' knowledge of the dangerous condition of the threshold equaled or exceeded his own. We have determined, as a matter of law, that the threshold was part of the condominium complex's common elements and, therefore, that it was under the homeowners' association's control, not Mr. Hahn's.

The answers to questions regarding the ownership and control of the various parts of the Kingswood Condominiums are to be found in the master deed. The provisions of a master deed should be interpreted according to the standard canons for interpreting written instruments. *14859 Moorpark Homeowner's Ass'n v. VRT Corp.*, 74 Cal. Rptr. 2d 712, 721 (Ct. App. 1998). Our task is to ascertain the intention of the parties to the instrument. *Rutherford County v. Wilson*, 121 S.W.3d 591, 595 (Tenn. 2003); *Jaffe v. Bolton*, 817 S.W.2d 19, 25 (Tenn. Ct. App. 1991). We

accomplish this task by considering the words in the instrument, *Hutchison v. Board*, 194 Tenn. 223, 227-28, 250 S.W.2d 82, 84 (1952), and by considering these words in the context of the instrument as a whole. *Collins v. Smithson*, 585 S.W.2d 598, 603 (Tenn. 1979); *Barber v. Westmoreland*, 601 S.W.2d 712, 714 (Tenn. Ct. App.1980). We must also give the words their usual, natural, and ordinary meaning. *Ballard v. North Am. Life & Cas. Co.*, 667 S.W.2d 79, 82 (Tenn. Ct. App. 1983).

The interpretation of a written instrument is a matter of law. *Rodgers v. Burnett*, 108 Tenn. 173, 184, 65 S.W. 408, 411 (1901); *City of Memphis v. Wait*, 102 Tenn. 274, 277, 52 S.W.161, 162 (1899); *Brown v. Brown*, 45 Tenn. App. 78, 95-96, 320 S.W.2d 721, 728 (1958). Because the interpretation of a written instrument is a question of law, interpretational issues are particularly suited to disposition by summary judgment. *See, e.g., Browder v. Logistics Mgmt., Inc.*, No. 02A01-9502-CH-00016, 1996 WL 181435, at *2 (Tenn. Ct. App. Apr. 17, 1996) (Tenn. R. App. P. 11 application withdrawn).

The "property"[10] of a condominium complex necessarily falls into one of two categories – the units or apartments[11] and the common elements.[12] Any portion of the property not included in the definition of a "unit" is part of the condominium complex's common elements.[13] Solely for the purpose of allocating costs and expenses among the unit owners,[14] a condominium complex's common elements are further divided into general common elements and limited common elements.[15] Limited common elements are common elements contiguous to and serving a single unit or a certain number of units to the exclusion of other units. For the purpose of the Kingswood Condominiums, the limited common elements include: (1) the separate furnace, air conditioner, and water heater within each unit, (2) the pipes, ducts, conduits, and electrical wiring within each unit, and (3) the patios and balconies appurtenant to each unit.[16]

A unit owner owns a fee simple interest in his or her unit,[17] as well as an undivided proportional interest in the condominium complex's common elements as a tenant in common with the other unit owners.[18] Subject to the restrictions provided in Tennessee's Horizontal Property Act and the condominium complex's master deed and bylaws, a unit owner has the right to the exclusive

_____

[10]Master Deed for Kingswood (May 16, 1983) § 1(p) ("Master Deed").

[11]Tenn. Code Ann. § 66-27-102(a)(1) (1993); Master Deed § 1(r).

[12]Master Deed § 1(g).

[13]Master Deed § 1(g).

[14]Master Deed § 14.

[15]Tenn. Code Ann. § 66-27-102(a)(7)-(8); Master Deed § 1(g), (i).

[16]Master Deed § 1(i); Bylaws of Kingswood, Exhibit B to Master Deed for Kingswood (May 16, 1983) art. V, § 1 ("Kingswood Bylaws").

[17]Tenn. Code Ann. § 66-27-106; Master Deed § 1(r)-(s).

[18]Tenn. Code Ann. § 66-27-106; Master Deed § 7.

use and possession of his or her unit and the limited common elements contiguous to and serving his or her unit.[19] If the unit owner shares a limited common element with other unit owners, his or her right to use the limited common element is shared with the owners of the other units.[20] A unit owner likewise shares the right to use the general common elements with all other unit owners.[21]

The responsibility for repairing and maintaining the condominium complex's property depends on whether the property involved is part of the common elements or part of an individual unit. As a general matter, the homeowners' association, acting through its board of directors, is responsible for the maintenance, repair, replacement, administration, and operation of the condominium complex's property, including the common elements.[22] Unit owners are only responsible for keeping their own unit "in good repair and order."[23]

The obligation to pay for needed maintenance and repairs does not strictly follow the obligation to maintain the property in good repair and safe condition. Unit owners have the exclusive obligation to pay for the maintenance and repair of their own unit.[24] The cost of maintaining and repairing common elements is borne by the unit owners collectively and is treated as a common expense to be paid by the homeowners' association or the managing agent acting at the association's direction.[25] However, the homeowners' association may require a unit owner to pay for the cost of maintaining, repairing, or replacing limited common elements appurtenant to their units or to arrange for the maintenance, repair, or replacement of these limited common elements at his or her own expense.[26]

Characterizing the metal threshold involved in this case as a general common element or a limited common element has little relevance in identifying the party responsible for maintaining the threshold in good repair and safe condition. A unit owner's responsibility to maintain the premises in a safe condition extends only to his or her unit.[27] The boundaries of a unit are "the interior surfaces of its perimeter walls, floor and ceilings," and the unit consists of the portions of the buildings constituting these boundaries and the air space encompassed within these boundaries, excluding any common elements. Thus, a unit owner is not responsible for maintaining the portions of a condominium's property beyond his or her unit in good repair or safe condition.

---

[19] Master Deed §§ 8, 16; Kingswood Bylaws art. V, § 1.

[20] Kingswood Bylaws art. V, § 1.

[21] Tenn. Code Ann. § 66-27-106; Master Deed § 8.

[22] Master Deed § 5(a); Kingswood Bylaws art. II, § 8(b), (f).

[23] Kingswood Bylaws art. V, § 1.

[24] Master Deed § 14; Kingswood Bylaws art. V, § 1.

[25] Master Deed §§ 5(a), (b), 10(a), 14.

[26] Master Deed § 14.

[27] Kingswood Bylaws art. V, § 1.

The metal threshold involved in this case is not part of Mr. Hahn's unit because it extends beyond the plane of the unit's interior walls. Because it is not part of Mr. Hahn's unit, it must necessarily be part of the condominium's common elements. Even though Mr. Hahn might have been required to pay for maintaining or repairing the threshold because it is a limited common element, the homeowners' association had the obligation to see that it was maintained in good repair and in a safe condition.

The record contains no evidence that Mr. Hahn either declined the Dentons' requests to repair or to maintain the threshold or that he had declined to pay for repairs to the threshold authorized or required by the homeowners' association. Accordingly, he was entitled to a summary judgment dismissing the Dentons' claims because, based on the undisputed facts, he did not breach any common-law or contractual duty to maintain the threshold in a safe condition. According to the Master Deed and the Kingswood Bylaws, this duty rested squarely on the shoulders of the homeowners' association.[28]

## V.
### THE HOMEOWNERS' ASSOCIATION'S LIABILITY

Concluding that the homeowners' association has a duty to maintain the threshold in a safe condition does not necessarily end the inquiry. To recover, the Dentons must still prove not only that the homeowners' association breached a duty and that this breach was the cause in fact of their injuries,[29] but also that they were comparatively less at fault for their injuries than the homeowners' association.[30] Based on the undisputed facts in this record, we have determined that the Dentons have failed to demonstrate that they will be able to prove that the homeowners's association had actual or constructive notice of the condition of the threshold prior to Ms. Denton's injury. We have also determined that, as a matter of law, the only conclusion that a reasonable fact-finder can draw is that the homeowners' association's fault, if any, did not exceed the fault reasonably attributable to the Dentons.

## A.
### The Requirement of Actual or Constructive Notice of the Dangerous Condition

Persons owning or controlling property have a duty to use reasonable care to protect others from unreasonable risks of harm by maintaining the premises in good repair and safe condition. *Woods v. Forest Hill Cemetery, Inc.*, 183 Tenn. at 424, 192 S.W.2d at 991; *Smith v. Archwood*

---

[28]Because we have concluded that Mr. Hahn did not have a duty to maintain the threshold in a safe condition, we need not address his claim that he is not liable to the Dentons because they knew as much about the condition of the threshold as he did.

[29]In any negligence action, liability arises only when the plaintiff establishes that the defendant breached a duty owed to the plaintiff and that this breach was the cause in fact of the plaintiff's injury. *Gunter v. Laboratory Corp. of Am.*, 121 S.W.3d 636, 639 (Tenn. 2003); *Burroughs v. Magee*, 118 S.W.3d 323, 327-28 (Tenn. 2003); *Waste Mgmt., Inc. v. South Cent. Bell Tel. Co.*, 15 S.W.3d 425, 430 (Tenn. Ct. App. 1997).

[30]*Jones v. Idles*, 114 S.W.3d 911, 913 (Tenn. 2003); *McNabb v. Highways, Inc.*, 98 S.W.3d 649, 652 (Tenn. 2003).

*Apartments*, No. 85-174-III, 1986 WL 8148, at *2 (Tenn. Ct. App. July 24, 1986) (No Tenn. R. App. P. 11 application filed). While they are not required to inspect their premises constantly, *Glassman v. Martin*, 196 Tenn. at 597, 269 S.W.2d at 909, they must use ordinary care to know or discover dangerous conditions. *Helton v. Reynolds*, 640 S.W.2d at 8; *Boyce v. Shankman*, 40 Tenn. App. 475, 481-82, 292 S.W.2d 229, 232 (1953). If they know or should know of an existing dangerous condition on the premises, the law imposes on them a duty either to repair or remove the condition or to help others avoid injury by warning them of the condition if it cannot be reasonably removed or repaired. *Basily v. Rain, Inc.*, 29 S.W.3d at 883.

Proof of the presence of a dangerous condition alone is not sufficient to trigger the duty to repair, remove, or warn. This duty will be imputed to a defendant only when the plaintiff proves that the defendant had actual or constructive notice of the condition and sufficient time to repair, remove, or warn against it. In the absence of proof of the defendant's actual knowledge of the condition, the plaintiff must prove that the condition had existed long enough that the defendant, in the exercise of reasonable care, should have discovered it. *Basily v. Rain, Inc.*, 29 S.W.3d at 884 (holding an apartment complex not liable to a tenant who tripped over a sprinkler head because the tenant failed to produce evidence that the sprinkler head had been stuck long enough to be discovered).

**B.**
**The Adequacy of the Dentons' Evidence of Actual or Constructive Notice**

The Dentons' negligence claim is plagued by inconsistencies regarding the nature of the dangerous condition that allegedly caused Ms. Denton's fall. In their complaint, they identified the dangerous condition as the "threshhold [sic] and/or gap between the threshhold [sic] and the concrete step."[31] As the litigation progressed, Ms. Denton asserted more particularly that the dangerous condition was the slanted condition of the surface of the threshold.[32] However, in an affidavit filed four months later, Mr. Denton insisted that the dangerous condition was the separation between the threshold and the concrete patio steps.[33] Notwithstanding these differences, both Mr. Denton and Ms. Denton insisted that the homeowners' association had actual or constructive notice of the dangerous condition, whatever it was, before Ms. Denton fell in 2000.

---

[31] The complaint also alleges that the building in which the Dentons' unit was located "has a history of structural problems caused by 'settling'" and that their unit in particular "has floors that are uneven and the threshhold [sic] has pulled away from the concrete step creating an offset and uneven gap between the threshhold [sic] and the step."

[32] In her February 20, 2002 deposition, Ms. Denton testified: "I slid off the threshold because it was slanted down that way."

[33] Mr. Denton stated that he was of the opinion that "the defect in the premises was the fact that the threshold and the concrete step underneath it were separated as a result of the settling of the building. The threshold itself was not defective, the gap was caused as a result of the settling of the foundation beneath it, which created a dangerous condition."

The homeowners' association categorically denied that it had either actual or constructive notice of the condition that caused Ms. Denton's fall.[34] Its motion for summary judgment attacked the adequacy of the Dentons' evidence regarding notice by asserting that they would be unable to prove that the homeowners' association had sufficient notice of the dangerous condition to trigger its duty to repair it. Specifically, the association argued that neither knowledge of a general settling problem nor knowledge of a 1998 accident regarding one of the Dentons' guests provided actual or constructive notice of the condition that caused Ms. Denton's fall.

Because the dissent has questioned the sufficiency of the homeowners' association's support of its motion, it would be well at this point to briefly restate the well-known principles regarding the burden of persuasion and production in summary judgment proceedings. These principles were established in 1993 when the Tennessee Supreme Court embraced and adopted the principles set out in three opinions of the United States Supreme Court regarding Fed. R. Civ. P. 56.[35] *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993).

Both the majority and the dissenter in *Celotex Corp. v. Catrett*, the trilogy's lead opinion, agreed on the basic principles regarding the burden of persuasion and production in summary judgment proceedings. The first principle is that the party seeking the summary judgment has the ultimate burden of persuading the court that no material factual dispute exists and that it is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. at 330, 106 S. Ct. at 2555; *Byrd v. Hall*, 847 S.W.2d at 215. The second principle is that once the moving party satisfies its initial burden of production, the burden of production shifts to the nonmoving party to demonstrate why the summary judgment should not be granted. *Celotex Corp. v. Catrett*, 477 U.S. at 330, 106 S. Ct. at 2555; *Byrd v. Hall*, 847 S.W.2d at 215. The third principle is that the court need not decide whether the moving party has satisfied its ultimate burden of persuasion unless and until the court finds that the moving party has discharged its initial burden of production. *Celotex Corp. v. Catrett*, 477 U.S. at 330-31, 106 S. Ct. at 2556; *Staples v. CBL & Assocs.*, 15 S.W.3d at 88; *Byrd v. Hall*, 847 S.W.2d at 208.

As a result of the *Celotex* trilogy, it is now beyond dispute that a moving party may premise its summary judgment motion on an attack on the nonmoving party's evidence. 10A Charles A. Wright et al., *Federal Practice and Procedure Civil* § 2727, at 472 (1998). While a moving party adopting this strategy is not required to support its motion with affidavits or other similar materials, *Celotex v. Catrett*, 477 U.S. at 323, 106 S. Ct. at 2553, it must do more than assert in a conclusory way that the nonmoving party has no evidence to prove its case. *Celotex Corp. v. Catrett*, 477 U.S. at 328, 106 S. Ct. at 2555 (White, J., concurring); *Byrd v. Hall*, 847 S.W.2d at 213. A moving party may satisfy its initial burden of production either by submitting affirmative evidence negating an essential element of the nonmoving party's case or by demonstrating that the nonmoving party's evidence itself is insufficient to establish an essential element of its claim. *Celotex Corp. v. Catrett*,

---

[34] Specifically, the association insisted that it "had no notice of the specific characteristic of the threshold that caused Ms. Denton to fall."

[35] *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2505 (1986); *Matsushita Elec. Indus. Cp. v. Zenith Radio Corp.*, 475 U.S. 524, 106 S. Ct. 1348 (1986).

477 U.S. at 330-36, 106 S. Ct. at 2556-59 (Brennan, J., dissenting); *Byrd v. Hall*, 847 S.W.2d at 215 n.5. [36]

After analyzing the United States Supreme Court's opinions, the Tennessee Supreme Court held that the *Celotex Corp. v. Catrett* opinion stands for the proposition that "a party may move for summary judgment demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a motion for directed verdict. If, after a sufficient time for discovery has elapsed, the nonmoving party is unable to demonstrate that he or she can indeed do so, summary judgment is appropriate." *Byrd v. Hall*, 847 S.W.2d at 213. The courts have consistently followed this holding for the past decade. *See, e.g., Chrisman v. Hill Home Dev., Inc.*, 978 S.W.2d 535, 539 (Tenn. 1998); *Wilson v. Rubin*, 104 S.W.3d 39, 47 (Tenn. Ct. App. 2002); *Fleck v. Cooper Realty Mgmt. Co.*, 84 S.W.3d 600, 602 (Tenn. Ct. App. 2002); *Green v. Sacks*, 56 S.W.3d 513, 519 (Tenn. Ct. App. 2001).

Unlike the dissent in this case, we do not view *Blair v. West Town Mall*, 130 S.W.3d 761 (Tenn. 2004) as a sign that the Tennessee Supreme Court has retreated from the basic burden of persuasion and production principles adopted eleven years ago. Rather, the decision represents a common sense application of these principles to the facts of that case. In *Blair v. West Town Mall*, a customer at a shopping mall who slipped on an oil slick in the mall's parking lot sued the mall using the "method of operation" theory of premises liability. The mall moved for summary judgment, asserting that its customer could not prove that the mall had actual or constructive notice of the oil spot. It supported its motion by pointing out the customer's concessions in her deposition that she was unaware of the oil spot before she slipped and that she did not know how long the oil spot had been there. *Blair v. West Town Mall*, 130 S.W.3d at 763. The court simply held that the mall had not carried its initial burden of production because the customer's testimony regarding her lack of knowledge had nothing to do with whether the mall itself had actual or constructive notice of the oil spot in a "method of operation" case. *Blair v. West Town Mall*, 130 S.W.3d at 763.

In light of Ms. Denton's unequivocal testimony that she fell because her foot slipped on the slanted surface of the threshold, we will disregard Mr. Denton's opinion regarding the crack between the threshold and the patio steps.[37] Thus, to survive the summary judgment, the Dentons must show that the homeowners' association had actual or constructive notice of the condition of the surface of the threshold in time to fix it. The Dentons have never claimed that the homeowners' association had actual notice of the condition of the surface of the threshold. Their only argument is that the association had constructive notice of this condition (1) because it was generally known that the

---

[36] Justice Brennan explained that the moving party's initial burden of production "may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of the documentary evidence. If there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories, and other exchanges between the parties that are in the record. Either way, however, the moving party must affirmatively demonstrate that there is no evidence in the record to support a judgment for the nonmoving party." *Celotex Corp. v. Catrett*, 477 U.S. at 331-332, 106 S. Ct. at 2557.

[37] Ms. Denton was the only person who witnessed the accident. Mr. Denton conceded that he did not see Ms. Denton fall and that he did not know how she fell.

buildings in the complex had settled and (2) because the association knew that one of the Dentons' guests had tripped over the threshold in 1998. These arguments avail the Dentons nothing.

Because the ultimate burden of persuasion is on the homeowners' association, we will construe the evidence in favor of the Dentons and will also give the Dentons the benefit of all reasonable inferences that can be drawn from the evidence. Thus, for the purposes of this opinion, we will take as true (1) that the association actually knew as early as 1988 that many buildings in the complex had settled, (2) that the association knew that the settling had caused sunken kitchen floors, uneven floors in other rooms, small cracks between the living room floor and the metal threshold of the door leading to the patio in some units, and similar cracks between the metal threshold and the concrete steps leading to the patio in some units, and (3) that the association knew that these conditions existed in the unit where the Dentons lived.

The homeowners' association's knowledge of some of the conditions caused by the settling does not establish that it was aware of the slanted surface of the threshold in the Dentons' unit. The Dentons have failed to present any evidence establishing a connection between the settling of the building and the condition of the threshold. Ms. Denton did not catch her heel in cracks adjacent to the threshold. She did not trip over the threshold itself. She testified unequivocally that her fall was caused by her foot slipping on the surface of the threshold because it was slanted down toward the patio. Thus, establishing a causal connection between the settling of the buildings in the complex and the surface of the threshold is a necessary ingredient to the Dentons' case.

The record contains no evidence that the homeowners' association had actual knowledge of the condition of the surface of the threshold prior to Ms. Denton's fall. There is likewise no evidence that the association should have known that the plane of the threshold had been altered by the settling of the building. The record is silent regarding whether the threshold was slanted or flat as originally designed and installed or whether the settling of the building had altered the plane of the top of the threshold in any way. Thus, the record contains no factual basis for concluding that the settling of the building affected the threshold or, if it had, that the homeowners' association had sufficient opportunity to discover and correct the problem with the threshold. Accordingly, the imputing knowledge of settling to the homeowner's association is not sufficient to stave off the summary judgment motion.

The Dentons also assert that knowledge of the condition of the surface of the threshold can be attributed to the homeowners' association because it knew that one of their guests had tripped over the threshold in 1998. Again, the dots do not connect because even the Dentons concede that the circumstances surrounding their guest's fall differ from the circumstances surrounding Ms. Denton's fall.[38] While the 1998 accident may have put the association on notice of the crack in the floor and the broken screen door, it did not provide actual or constructive notice of any other potentially dangerous condition involving the surface of the threshold.

_____

[38] In their response to the homeowners' association's statement of undisputed facts, the Dentons concede that "Ms. Denton indicates that her heel 'slid off the threshold because it's slanted down'; and Ms. Dady . . . stated that 'the heel of her shoe just stopped on the threshold'. Accordingly, it is undisputed that Ms. Denton did not trip on the threshold in the same manner that Ms. Dady had in 1998."

The 1998 incident is so dissimilar to Ms. Denton's fall two years later that it provides no basis for imputing knowledge of some other condition involving the threshold to the homeowners' association. Without evidence that the association had actual or constructive knowledge of the existence of the dangerous condition that caused Ms. Denton to fall in 2000, the Dentons cannot hold the association liable for the injuries she sustained when she fell. Accordingly, the trial court correctly granted the homeowners' association's summary judgment motion.

## C.
## The Comparative Fault of the Parties

One other insurmountable hurdle faces the Dentons in this case. It consists of the principle that tenants who have equal or superior knowledge of a dangerous condition should not recover from the owners of the premises for injuries caused by the dangerous condition. *Manes v. Hines & McNair Hotels*, 184 Tenn. 210, 214, 197 S.W.2d 889, 890-91 (1946); *Roberts v. Roberts*, 845 S.W.2d 235, 228 (Tenn. Ct. App. 1992). While this manifestation of the assumption of the risk doctrine has been assimilated into our current system of comparative fault,[39] under the undisputed facts of this case, we have determined that no reasonable juror would hold the homeowner's association liable for the Dentons' injuries.

The allocation of fault is ordinarily a question of fact for the jury or the trial court sitting without a jury. *Brown v. Wal-Mart Discount Cities,* 12 S.W.3d 785, 789 (Tenn. 2000). The task of allocating fault should be taken from the fact-finder only when it can be determined beyond question (or alternatively, when reasonable minds cannot differ) that the plaintiff's fault is equal to or greater than the defendant's. *Staples v. CBL & Assocs.,* 15 S.W.3d at 91-92; *Eaton v. McLain,* 891 S.W.2d 587, 589 (Tenn. 1994); *Kim v. Boucher,* 55 S.W.3d 551, 556-57 (Tenn. Ct. App.2001). Courts, however, are obliged to dispose of claims when warranted by the evidence, and we have not shirked our responsibility when the facts demonstrate that the plaintiff's fault was equal to or greater than the defendant's. *See, e.g., Morgan v. State*, No. M2002-02496-COA-R3-CV, 2004 WL 170352, at *7 (Tenn. Ct. App. Jan. 27, 2004); *Taylor v. Square D Co.*, No. M2002-01620-COA-R3-CV, 2003 WL 23093835, at *5-6 (Tenn. Ct. App. Dec. 30, 2003), *perm. app. denied* (Tenn. June 1, 2004).

The Dentons lived in the unit at the Kingswood Condominiums for over twenty years. They used the patio door every day to enter and exit their unit. There is no question that their knowledge of the condition of their unit, including the threshold, was superior to both Mr. Hahn who purchased the unit in 1997 and to the homeowners' association. The association has even less reason than Mr. Hahn to be familiar with the condition of the interior of the Dentons' unit. The record contains sparse evidence regarding the homeowners' association's knowledge of the interior condition of the unit, and it contains absolutely no evidence that the Dentons complained to the homeowners' association that the threshold was dangerous or that they requested that the threshold be repaired. Even under the strictures of comparative fault, and even acknowledging that finding a plaintiff more

---

[39]*Perez v. McConkey*, 872 S.W.2d 897, 905 (Tenn. 1994) (holding that implied assumption of the risk is no longer a complete bar to recovery); *Arzanzarrian v. Johnstown Props., Inc.*, No. 01A01-9406-CV-00259, 1994 WL 672675, at *4 (Tenn. Ct. App. Dec. 2, 1994) (No Tenn. R. App. P. 11 application filed) (holding that the traditional bar against recovery by tenants with equal or superior knowledge of a dangerous condition was a species of implied assumption of the risk that has been subsumed into the doctrine of comparative fault).

at fault than a defendant is a dramatically endangered species, we conclude that no reasonable trier of fact could conclude otherwise in this case.

## VI.

We affirm the judgment dismissing the Dentons' claims against Mr. Hahn and the Kingswood Homeowners' Association and remand the case to the trial court for whatever further proceedings may be required.  We tax the costs of this appeal to Donna Denton, Robert Denton, and their surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., P.J., M.S.