**Sherry HELTON, Administratrix of The Estate of Tony Linn Helton, and Herbert H. Helton, Plaintiffs-Appellees,**

v.

**Harris REYNOLDS, Defendant-Appellant.**

Court of Appeals of Tennessee, Eastern Section.

March 19, 1982.

Application for Permission to Appeal Denied by Supreme Court Oct. 4, 1982.

James O. Phillips, III, William E. Phillips, Rogersville, for defendant-appellant.

Thomas D. Shelburne, Rogersville, for plaintiffs-appellees.

## OPINION

GODDARD, Judge.

Harris Reynolds, Defendant-Appellant, appeals a $70,000 judgment rendered against him in favor of Sherry Helton, Administratrix of the estate of Tony Linn Helton, and Herbert H. Helton, Plaintiffs-Appellees, for the wrongful death of their son who was tragically drowned in an open pit located on the Defendant's property.

The Appellant presents five issues which question (1) the Court's charge to the jury relative to the Defendant's gross negligence, (2) his failure to sustain a motion for directed verdict, (3) his charge to the jury as to damages, and his denial of the Defendant's special request relative thereto, (4) his refusal to grant a new trial when (a) the weight of the evidence favored the Defendant and (b) the jury's verdict was contrary to the law and evidence, and (5) his repeating the charge relative to gross negligence after the jury had deliberated for a period and returned for further instruction.

The Heltons entered into an employment agreement with Mr. Reynolds on Wednesday, March 15, 1978. The agreement, which was terminable at the will of either party, called for the Plaintiffs to perform milking and other incidental duties on Mr. Reynolds' dairy farm and in return they would each receive $125 per week plus use and possession of Mr. Reynolds' tenant house. When the Heltons actually moved into the tenant house on the following Saturday, their two children, Tony Linn Helton, age two years, nine months, and Danny Helton, age four years, ten months, along with two of Mr. Helton's brothers, Michael, age 14, and Ralph, age 17, were living with them.

Located approximately 10 feet from the tenant house was an open pit dug preparatory to laying a field line for a septic tank which served the house. The pit, which was eight to 10 feet wide and 30 to 40 feet long, was filled with water. The parties recognized the dangerous nature of the pit and the need to fill it in, but there is conflicting testimony as to the time when the work would be done. Mrs. Helton testified that on the Sunday morning after they had moved in on Saturday, while at the milking barn, she asked about the pit and that Mr. Reynolds volunteered, "I didn't have to ask him. He volunteered. He said, 'I've been needing to get that done. I'll get Jay or Bill [his two sons] to come over there tomorrow and fix that up.'" However, Mr. Reynolds testified that he told both Mr. and Mrs. Helton that he would "fix it just as soon as it dried up" so that he could get a truck in.

The following Saturday, March 25, at approximately 9:00 a.m., the Heltons went to the milking barn to clean. Prior to leaving for the barn they instructed Michael and Ralph Helton to watch the younger children and to keep them away from the side of the house where the pit was located. At this time two neighbor children, Timmy and Michael Johnson, were also at the house. While watching the younger children Ralph Helton and Mike Johnson decided to go to the barn (about 500 feet from the tenant house) to seek permission for Ralph to spend the night with Mike. Prior to leaving Ralph instructed Michael Helton to watch the children. As Mike Johnson and Ralph were returning from the barn Timmy Johnson came running to them saying that Tony had drowned. When Ralph ran back to the house he saw Tony Helton floating face down in the water with a big wheel tricycle, which he had been riding, floating nearby. Tony was pulled out of the pit and taken to the hospital where he was pronounced dead on arrival.

8

Two or three days after the accident Mr. Reynolds completed work on the field line even though some of the machinery used became mired. There is also proof that because of the weather conditions the work was not completed "like it should have been."

A helpful discussion of a landlord's liability by Professor Dix W. Noel is found in 30 Tenn.Law Rev. 368, where much of what we will say on this subject is found.

■ Historically a lease transaction was considered to be a sale of an interest in land. This apprehension severely limited the landlord's tort liability for defects in leased premises. The doctrine of *caveat emptor* allowed the landlord to knowingly lease premises that were in a dangerously defective condition and placed the burden on the lessee to determine the condition of the premises prior to the actual lease. If the premises later proved to be defective the landlord was under no obligation to repair because, as mentioned above, the estate was deemed to have been transferred and the lessor had no right to unilaterally enter the premises.

■■ The harsh common law rule, however, was ameliorated by an exception which provided that a landlord would be liable for dangerous conditions known to him but not disclosed to his tenant. Tennessee follows the general rule but has broadened the exception to include dangerous conditions which the landlord could have learned by the exercise of proper care and diligence. *Hines v. Willcox*, 96 Tenn. 148, 33 S.W. 914 (1896). Moreover, under the general rule as well as The Restatement of Torts, § 356 (1934), the rule of non-liability for obvious defects applies not only to a suit by the tenant, but others who may enter the premises with the tenant's consent.

■ In light of the foregoing we conclude that as to the Plaintiffs' first theory of liability—conventional negligence may not be sustained, and the Trial Court should have directed a verdict in the Defendant's favor. We say this because we believe, even when viewing the proof in the light most favorable to the Plaintiffs, that the danger associated with the open water-filled pit was as obvious to the Heltons as it was to Mr. Reynolds, a circumstance under the authority above cited which would preclude Mr. Reynolds being cast in judgment. Indeed, taking the charge of the Trial Court on this subject, hereinafter set out, it is apparent as to this theory that reasonable minds could not differ under the facts of this case:

Ordinarily an owner of premises leased to a tenant is not liable for any injury to the tenant or member of his household that results from a dangerous condition of the premises which existed when the tenant took possession, however, when the tenant took possession of the premises there was some unsafe condition of which the owner had actual knowledge, or in the exercise of reasonable care, should have known, but which was not known to the tenant, and the danger of which was not apparent and was not such as would have been discovered by a reasonable inspection of the premises, the owner was under a duty to inform the tenant of the danger and if the owner failed to do so he is subject to liability to the tenant, or to the members of his household, for injuries resulting from the unsafe condition.

Notwithstanding our determination with regard to the first theory, because of T.C.A. 20–9–502[1] and of decisional law, the judgment must still be affirmed if the proceedings as to a second theory are free of reversible error. *Clinchfield Railroad Co. v. Forbes*, 57 Tenn.App. 174, 417 S.W.2d 210 (1966); *Monday v. Millsaps*, 37 Tenn.App. 371, 264 S.W.2d 6 (1953); *City Transp. Corp. v. Seckler*, 32 Tenn.App. 661, 225 S.W.2d 288 (1949).

■ Where a tenant was able to bargain for a promise to repair the premises, the

1.    *20–9–502. Verdict applied to good account.*—If any counts in a declaration are good, a verdict for entire damages shall be applied to such good counts.

majority of the courts traditionally treated any breach of the agreement as a mere breach of contract and when personal injury resulted from the breach damages were limited to the cost of making the repair. This view was premised on the belief that the landlord's role in making repairs was no greater than that of a carpenter under contract. However, Tennessee courts, following the modern trend of the law recognizing the special relationship between a landlord and his tenant, hold the landlord liable for personal injuries resulting from the negligent breach of a promise to repair. In *Merchants' Cotton Press & Storage Co. v. Miller,* 135 Tenn. 187, 196, 186 S.W. 87, 89 (1916), the Supreme Court articulates the justification for imposing this burden on the lessor:

> There is no undue hardship on the lessor in such case. He has seen fit to interpose his own agreement to repair, and thereby tended, at least, to cause the lessee to hold back and wait for its execution on his part. He has elected to retain for his own, as primarily resting on him, the duty of care in the particular regard, and should not complain if the law leaves the burden where he placed it and holds him not exempt.

> "To suffer such an exemption ... we think would be contrary to public policy and substantial justice, for it would not unfrequently operate to deprive the injured party of all remedy except against an irresponsible tenant through whom a negligent landlord would reap the profits, without bearing the responsibilities, of his proprietorship." *Campbell v. Portland Sugar Co.,* 62 Me., 552, 16 Am.Rep., 503.

■ While the duty to repair is a tort duty, it arises out of the contract which delineates the duty owed. Thus the promise to repair must be supported by adequate consideration. In *Boyd v. McCarty,* 142 Tenn. 670, 222 S.W. 528 (1919), the Court held that the promise to repair was not supported by any consideration and was a mere *nudum pactum.* In *Boyd* the Court appeared to emphasize the fact that the lease was for a term of years and had been paid for with notes. However, in *Gary v. Spitler,* 10 Tenn.App. 34 (1928), the Court distinguished *Boyd* by noting the month-to-month nature of the lease in question. The Court concluded that the plaintiff could have vacated the premises upon short notice thus relieving herself of the obligation to pay rent. The Court held that it could not be stated that the agreement to continue renting the premises was not adequate consideration for a promise to repair. While this appears to be the most widely accepted view it should be noted that in the subsequent case of *Talley v. Curtis,* 23 Tenn.App. 181, 129 S.W.2d 1099 (1939), the Court suggested that a promise to repair was made without adequate consideration even though the lease was on a month-to-month basis and presumably the tenant had the same ability to leave upon short notice as those in *Gary.*

In the present fact situation the tenancy was terminable at the will of either party and would appear to fall within the *Gary* standard for determining adequate consideration. The specific nature of the tenancy in question would seem to give further credence to the Heltons' claim of valid consideration in light of the apparent need of the landlord to have someone working the farm as opposed to merely occupying the premises. However, even though Mrs. Helton testified the promise to repair was made voluntarily by the Defendant, thus giving the appearance of a gratuitous favor, both Mr. and Mrs. Helton testified that absent such promise they would not have continued their tenancy.

■ Even if the promise is supported by adequate consideration the tenant may be negligent if he relies on it for an unreasonable length of time. The determination of what is reasonable is ordinarily for the jury. *Robinson v. Tate,* 34 Tenn.App. 215, 236 S.W.2d 445 (1950). If the danger is imminent and serious it is gross negligence for the tenant to remain on the premises for any length of time, and the court may hold as a matter of law that the plaintiff was contributorily negligent. The following cases provide some indication of the

varying attitudes of the court in determining whether a defect is serious or imminent. *Talley v. Curtis,* supra; *Pass v. Jones,* 16 Tenn.App. 321, 64 S.W.2d 511 (1932); *Hamilton v. Moore,* 14 Tenn.App. 584 (1932), hold the plaintiff guilty of contributory negligence as a matter of law, while two other cases, *Gary v. Parker,* 55 Tenn.App. 249, 399 S.W.2d 325 (1965), and *Gary v. Spitler,* supra, hold otherwise.

We preface our remarks regarding the facts of this case as it relates to the promise to repair theory by observing that the proof regarding Mr. Reynolds' promise to repair on the following day is extremely tenuous, and viewing the proof as a whole it would seem much more likely to us that Mr. Reynolds' testimony, which is corroborated by his son, that he promised to complete the field line when the weather permitted (Mr. Helton candidly admits that this was the representation made to him), is more likely the correct version. However, we do believe that reasonable minds could differ as to this point and are bound, in light of the Trial Court's approval of the verdict, to accept Mrs. Helton's account. Having done so, it is clear that Mr. Reynolds did not complete the work on the next day as promised. However, as pointed out by Professor Noel, with appropriate citations (page 372), liability does not necessarily follow:

Even where the lessor has covenanted to repair, he is not an insuror against harm from defects. So if the landlord has used due care to discover and remedy a dangerous condition, the court is apt to find that there is no breach of the covenant. Even where a breach has occurred, this does not always lead to liability, for the disrepair must have created an unreasonable risk to persons on the land which performance of the covenant would have prevented. In other words, liability for injury results only where failure to repair has been negligent with reference to personal safety.

We feel that in light of the proof that Mr. Reynolds was able to complete the job within two or three days after the accident, albeit not without difficulty, and that it was dry enough during the week for the Heltons to plant a garden, reasonable minds could differ as to whether Mr. Reynolds' breach was negligent. The same can also be said as to the question of the Heltons' contributory negligence in remaining in the house.

We conclude that under the facts of this case the question of whether the Defendant negligently breached his agreement to repair and whether the Plaintiffs justifiably relied upon the promise was properly submitted to the jury, as was the question of their contributory negligence.

Turning now to the question of gross negligence as it relates to the second issue, the recent case of *Thomason v. Wayne County,* 611 S.W.2d 585 (1980), at page 587, restates the Tennessee definition as follows:

Gross negligence indicates a conscious neglect of duty or a callous indifference to consequences. *Tipton Co. Board of Education v. Dennis,* 561 S.W.2d 148 (Tenn. 1978). In *Stagner v. Craig,* 159 Tenn. 511, 19 S.W.2d 234 (1928), gross negligence was defined as "such entire want of care as would raise a presumption of a conscious indifference to consequences."

We are persuaded that under the facts of this case, particularly the unfavorable weather conditions which resulted in the pit standing full of water the entire period in question, reasonable minds must conclude that Mr. Reynolds, in failing to complete the septic tank repair as promised, was not guilty of reckless disregard for the rights of others, and the Trial Court's failure to sustain his motion for a directed verdict as to the gross negligence feature of the case, as well as the charge to the jury in respect thereto, was error.

While an arguable position may be taken that the error was harmless, we are persuaded otherwise. We say this because even though punitive damages were not awarded, Mr. Reynolds still might be cast in judgment on the theory he was guilty of gross negligence while the Heltons were guilty of only ordinary negligence. It is

clear this point was on the minds of the jurors, as shown by the contents of a note sent to the Court after the jury had deliberated for a period:

(1) "Review the difference between charging gross negligence and negligence to both parties."

(2) "If we charge both parties with negligence what will that constitute in regards to a verdict?"

(3) "If we cannot agree upon what constitutes a reasonable length of time to repair the ditch can we come to a verdict?"

(4) "Would it be possible for us to have a copy of your Charge to us?"

We note that the gross negligence charge was given to the jury on three occasions. First, with the regular charge, second, in response to the note above quoted, and thereafter when the Court re-charged his original charge in its entirety. Moreover, it would seem to us that the jurors might surmise that there was some evidence to support the gross negligence theory or they would not have been told about it on three separate occasions. We thus conclude a reversal is required under Rule 36(b) T.R.A.P. in that the error "more probably than not affected the judgment."

We pretermit all other issues raised, including a particularly thorny question which is not necessary to the determination of this case:[2] Is an injured party who under Tennessee law is entitled to recover based upon the landlord's agreement with the tenant to which he was not a party chargeable with the tenant's negligence?

For the foregoing reasons the issues directed to the Court's failing to direct a verdict as to the first theory and as to the gross negligence feature of the case, as well as to the charge of gross negligence, are found favorably to the Defendant, the Trial Court reversed and the cause remanded for trial on the issue of negligent breach of promise to repair. Costs of appeal are adjudged against the Plaintiffs.

**2.** In the case at bar, the parents being next of kin are the beneficiaries of the proceeds of any recovery and, consequently, a defense may unquestionably be based upon their negligence.

SANDERS, J., concurs.

FRANKS, J., dissents.

FRANKS, Judge, dissenting.

I dissent and would affirm the jury's verdict as approved by the trial judge.

Judge Goddard quotes from *Cotton Press & Storage Co. v. Miller,* 135 Tenn. 187, 186 S.W. 87 (1916), which appears to comport with the *Restatement (Second) of Torts,* §§ 357, 378. This theory of liability is succinctly expressed in Prosser, *The Law of Torts,* (4th ed., 1971):

[T]he landlord by his promise has induced the tenant to forego repairs of his own, and by his misleading undertaking has made himself responsible for the consequences, and that he is distinguished from other contractors by the peculiar probability that the tenant will rely on him. . . . It seems clear that it is the contract itself which gives rise to the tort liability, and that it is distinguished from other contracts to enter and repair by reason of the peculiar relation existing between the parties, which gives the lessee a special reason and right to rely upon the promise. This, together with an undeclared policy which places the responsibility for harm caused by disrepair upon the party best able to bear it, and most likely to prevent the injuries, at least where he has expressed willingness to assume responsibility, . . .

At 410.

The majority opinion gratuitously disparages decedent's mother's testimony but ultimately concludes, as is required, that only the proof most favorable to the plaintiff be considered and all unfavorable evidence disregarded in determining whether the evidence is sufficient to support the jury's verdict.

I do not accept the premise advanced in the majority opinion that gross negligence

*Smith v. Henson,* 214 Tenn. 541, 381 S.W.2d 892 (1964); *Anderson v. Memphis St. Ry. Co.,* 143 Tenn. 216, 227 S.W. 39 (1920).

was not properly an issue in the case. The evidence establishes the defendant promised to "fix that up" on Monday, the next day, following the mother's concerned inquiry on Sunday. Defendant knew of the existence of the pit and the standing water and his agreement to repair promptly evidences an awareness of the dangerous condition since the pit was adjacent to the tenant house. He knew the tenants, parents of the small child, were required to be away from their children for long periods of time while performing farming chores required by defendant. Defendant failed to make repairs or take any steps to protect small children known to be present for a period of six days following the date he agreed to make repairs. I believe a jury issue was presented as to whether defendant consciously or recklessly disregarded his duty[1] to provide reasonably safe premises for his tenants' family. In *Thomason v. Wayne County,* 611 S.W.2d 585 (Tenn.App.1980), this Court stated:

> Gross negligence indicates a conscious neglect of duty or a callous indifference to consequences. *Tipton Co. Board of Education v. Dennis,* 561 S.W.2d 148 (Tenn. 1978). In *Stagner v. Craig,* 159 Tenn. 511, 19 S.W.2d 234 (1928), gross negligence was defined as "such entire want of care as would raise a presumption of a conscious indifference to consequences". 611 S.W.2d, at 587.

The salient inquiry, then, is whether defendant acted or failed to act in a manner such as to indicate a callous or conscious disregard of the rights of the decedent.

The failure to act in the face of a known dangerous situation may be gross negligence. *Inter-City Trucking Co. v. Daniels,* 181 Tenn. 126, 178 S.W.2d 756 (1944). *Also see Garner v. Maxwell,* 50 Tenn.App. 157, 360 S.W.2d 64 (1961); *Neal et al. v. Midgett,* 29 Tenn.App. 520, 198 S.W.2d 32 (1946).

Our Supreme Court has indicated the emphasis to be placed on a negligent omission in the face of known danger. In *Tipton Cty. Bd. of Ed. v. Dennis,* 561 S.W.2d 148 (Tenn.1978), leaving a stalled vehicle on the road on a dark, rainy morning to call a mechanic was not gross negligence where the driver had turned on the vehicle's caution lights and left another to direct traffic. The case of *Thomason v. Wayne County, supra,* is of like import. In *Thomason,* it was alleged a county maintained guardrail was insufficiently repaired and, as such, caused the death of the driver whose automobile struck the rail. It was further alleged that the improper repair created a dangerous condition, the maintenance of which was gross negligence by the county. The Supreme Court held the fact the county repaired the guardrail indicated it was not guilty of consciously neglecting its duty and as such there was no gross negligence: any negligence in connection with the repair was ordinary negligence. It can be inferred from *Thomason* that, had the county not repaired the damaged guardrail with knowledge of its damage, it could be guilty of gross negligence.

Clearly, the defendant's failure to fill the pit or take other reasonable precautions to guard against children falling into the pit is evidence from which reasonable minds could differ as to whether the defendant was guilty of callous indifference or consciously neglecting his duty to deceased; moreover, doing absolutely nothing for six days in regard to the open pit following the date he agreed to repair, all the while knowing the small child was left in the home at times without parental supervision, to me, raises "a presumption of conscious indifference to consequences". I would affirm the judgment of the trial court.

---

1. The contract gives rise to the duty and ordinary tort law principles become applicable.