IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 23, 2006 Session

## ANESTHESIA MEDICAL GROUP, P.C. v. PAMELA GREER CHANDLER

**Appeal from the Chancery Court for Davidson County**
**No. 02-3102-II     Carol L. McCoy, Chancellor**

—————————

**No. M2005-00034-COA-R3-CV - Filed on February 6, 2007**

—————————

The plaintiff medical group loaned money to the defendant nurse for tuition at a school that trained its students to become nurse anesthetists. As part of the arrangement, the student promised to work for the group for three years after graduation. Seven months prior to graduation, the student notified the group that she would not be able to work for it upon completion of her training. She paid the loan back with interest, but the medical group filed suit to enforce a $15,000 liquidated damages clause in the loan contract. The student then filed a motion for summary judgment, which the trial court granted. The court held that the sum demanded constituted an impermissible penalty rather than a valid provision for liquidated damages and, thus, that it was unenforceable as a matter of law. We reverse the grant of summary judgment to the student and affirm the denial of summary judgment to the medical group because we find that the undisputed facts do not show that either party is entitled to judgment as a matter of law.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part, Reversed in Part, and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and WILLIAM B. CAIN, J., joined.

Andrea Taylor McKellar, Nashville, Tennessee, for the appellant, Anesthesia Medical Group, P.C.

Kaz Kikkawa, William A. Blue, Jr., Nashville, Tennessee, for the appellee, Pamela Greer Chandler.

### OPINION

#### I. THE AGREEMENT

Anesthesia Medical Group ("AMG") is a large practice group of anesthesiologists in Middle Tennessee which employs certified registered nurse anesthetists ("CRNAs"). Pamela Greer is a registered nurse who wished to become a CRNA. In August of 1998, she enrolled in the Middle

Tennessee School of Anesthesia, which offers a course of study of approximately two years to prepare its students to take the boards and meet the other requirements for CRNA certification.

AMG operates a program that offers educational loans to CRNA candidates. After seeing an advertisement for AMG's loan program on a school bulletin board, Ms. Greer contacted the practice group and filled out an application. She was accepted into the program and executed a contract on March 26, 1999. The contract was titled "LOAN AGREEMENT - CRNA EDUCATION PROGRAM," and it included both loan and employment provisions.

The basic bargain between the parties and their contemplated exchange of consideration is outlined at the very beginning of the contract, immediately following the identification of the parties:

> Student intends to pursue a course of training to become a certified registered nurse anesthetist (CRNA) through a full time education program leading to such certification.

> AMG is willing to assist in providing funds for tuition for Student's education, provided that Student agrees to work for AMG once Student has completed training and becomes a CRNA, upon the following terms and conditions.

The above-mentioned terms and conditions included a loan from AMG to Pamela Greer of up to $22,500 for tuition assistance in exchange for her promise to work for AMG once she completed her training and became a CRNA. Ms. Greer was obligated to begin full-time employment for AMG within thirty days of her certification as a nurse-anesthetist and to work for AMG for a period of three years. If she successfully completed the three years of employment, repayment of the loan would be forgiven.

If, however, Ms. Greer defaulted on her obligation by either failing to complete the program, failing to take or pass the certification examination, or failing to comply with any other provision of the agreement, immediate repayment of the loan would be required, including the payment of interest. Under the terms of the agreement, the costs of collection in the event of default, including court costs and attorney fees, would also have to be paid by Ms. Greer.

The agreement listed five events that constituted "Events of Default," and two of those events triggered the obligation of the student to pay the additional amounts that are in dispute in this case. Specifically, if the student (1) failed to begin full-time employment with AMG within thirty days of graduation or (2) failed to fulfill the three year term of employment, then student agreed to pay AMG additional amounts: $15,000 if termination occurred prior to or during the first twelve months; $10,000 if during the second twelve months, and $5,000 if during the final twelve months.

-2-

The provision establishing these additional payments did not refer to them as liquidated damages, but the parties' choice of language does not determine the nature of the provision. *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 97 (Tenn. 1999) (holding that "[a] contractual provision need not explicitly include the term 'liquidated damages' to constitute a liquidated damages provision.")

The term "liquidated damages" means a sum agreed upon by contracting parties at the time they enter into their contract, to be paid as compensation for damages suffered by one party in the event that the other breaches the contract. *V.L. Nicholson v. Transcon Investment*, 595 S.W.2d 474, 484 (Tenn. 1980). Because the clear language of the provision in the contract before us makes the payment due or conditioned upon a breach, or in this contract an "event of default," it is clearly a liquidated damages provision. *Guiliano*, 995 S.W.2d at 97.

As further evidence of the parties' intent as to these provisions, the rationale for liquidated damages in addition to the loan repayment was enunciated in the agreement as follows:

> Student and AMG through their execution of this agreement hereby acknowledge that AMG has invested substantial time and monies in the development and training of Student[1] and that Student's termination would detrimentally affect the operations of AMG. Student and AMG further agree that the harm to AMG would be difficult, if not impossible, to quantify and that the above amounts are reasonable and appropriate under the circumstances and fairly represent that loss which would be suffered by AMG. Payment shall be made within thirty (30) days of the date of separation.

Ms. Greer borrowed a total of $22,500, signing three separate promissory notes on May 5, 1999 (for $2,000), on July 7, 1999 (for $9,700), and on May 5, 2000 (for $10,800). Each promissory note referenced the Loan Agreement, including specific reference to the events of default triggering immediate repayment and costs of collection, and the Loan Agreement in its entirety was incorporated into each promissory note.

Pamela Greer fell in love with and married David Chandler during her CRNA training. Because she changed her name when she married, we will hereinafter refer to Ms. Greer as Pamela Chandler. David Chandler was a project manager/engineer for nuclear power plants who was working in Huntsville, Alabama. He attempted to find a job in Nashville, but was unsuccessful.

On May 30, 2001, seven months before she was scheduled to graduate from the Middle Tennessee School of Anesthesia, Ms. Chandler wrote a letter to AMG advising the group that she would not be working for them after graduation. She stated that it had become clear to her that she would have to move to Huntsville to be with her husband. AMG does not operate in Huntsville. Ms. Greer's affidavit stated that "I wanted to give AMG as much advance notice as possible."

---

[1]Ms. Greer asserted that there was absolutely no affiliation or other connection between AMG and the Middle Tennessee School of Anesthesia. AMG did not dispute this assertion.

After receiving the letter from Ms. Chandler, AMG told her that it would require payment of the principal amount of the loan, over $4,000 in interest, and the additional $15,000 due as liquidated damages under the agreement. Ms. Chandler paid AMG the principal and interest and asked them to forgive the $15,000 because she did not feel it was justified under the circumstances. AMG did not agree.

## II. TRIAL PROCEEDINGS

AMG filed suit in the Chancery Court of Davidson County, asking the court to order Ms. Chandler to pay the $15,000 it believed she owed as liquidated damages under the contract or, in the alternative, its actual damages resulting from her breach of the agreement. Ms. Chandler's answer stated several defenses, including assertions that the liquidated damages provision was in actuality a penalty, and thus contrary to public policy; that the contract could not be enforced because it "violated Tennessee's strong public policy against unreasonable restraints of trade;"[2] and that AMG had failed to mitigate its damages.

AMG subsequently filed a motion for summary judgment, which was followed by Ms. Chandler's motion to be allowed to amend her answer to state a counter-claim for usury. The amended answer contended that the contract was usurious on its face,[3] and asked the court to order a refund of twice the amount of interest collected and payment of her reasonable attorney fees and punitive damages. Her motion to amend was granted. Ms. Chandler then filed her own motion for summary judgment, asking the court to dismiss AMG's claims and grant her judgment on the usury claim.

The trial court conducted a hearing on the competing summary judgment motions, and by subsequent order dismissed AMG's claims in their entirety, essentially denying AMG's motion for summary judgment and granting Ms. Chandler's. The court found, "as a matter of law, that the $15,000 'liquidation fee' contained in Plaintiff's CRNA Loan Agreement is an unenforceable penalty."[4] The court further found that the evidence showed that the $15,000 additional payment was not a reasonable estimate of potential damages AMG would suffer if the "alleged" contract were

---

[2]Ms. Chandler claimed that AMG's loan agreements included what amounted to covenants not to compete. She contended that the damages clauses in those contracts were used to discourage CRNA graduates from working in competition with anesthesiologists as independent practitioners.

[3]The loan agreement carried an interest rate upon default of "SunTrust Bank's prime plus four percent." Ms. Chandler asserted that this resulted in an effective interest rate of 11% per annum, which is in excess of the statutory 10% maximum set out in Tenn. Code Ann. § 47-14-102 et seq. AMG admitted in a response to Ms. Chandler's statement of undisputed facts that Ms. Chandler paid back the money it advanced at an interest rate of 11%.

[4]The court stated it had made a similar finding in another case after a one-day bench trial. That case, *Anesthesia Medical Group, P.C. v. Buras*, was subsequently appealed to this court, and we are aware it involved a contract identical to the one signed by Ms. Chandler. *See Anesthesia Medical Group, P.C. v. Buras*, No. M2004-01599-COA-R3-CV, 2006 WL 2737829 (Tenn. Ct. App. Sept. 25, 2006)(No Tenn. R. App. P. 11 application filed). We reversed the trial court's ruling on this issue.

-4-

breached. The court also held, as a matter of law, that the alleged contract lacked consideration adequate to support a binding employment commitment on AMG's part because it did not impose an obligation on AMG to employ Ms. Chandler and only offered her an illusory promise of possible future employment.[5] The trial court also found that AMG had not sustained damages beyond the tuition monies loaned, which had been paid back with interest.

The court also recited Ms. Chandler's argument that the contract was not enforceable because it constituted an unreasonable restraint of trade and her counterclaim based on the allegation that the agreement was usurious, but held that there was insufficient evidence in the record to rule on those claims. The court accordingly held that Ms. Chandler's usury counterclaim was still viable and pending. Ms. Chandler subsequently dismissed the counterclaim, thus making the trial court's summary judgment final for purposes of appeal.

## III. STANDARD OF REVIEW

A trial court's decision on a motion for summary judgment enjoys no presumption of correctness on appeal. *BellSouth Advertising & Publishing Co. v. Johnson,* 100 S.W.3d 202, 205 (Tenn. 2003); *Scott v. Ashland Healthcare Ctr., Inc.*, 49 S.W.3d 281, 284 (Tenn. 2001); *Penley v. Honda Motor Co.*, 31 S.W.3d 181, 183 (Tenn. 2000). We review the summary judgment decision as a question of law. *Finister v. Humboldt Gen. Hosp., Inc.*, 970 S.W.2d 435, 437 (Tenn.1998); *Robinson v. Omer*, 952 S.W.2d 423, 426 (Tenn.1997). Accordingly, this court must review the record *de novo* and make a fresh determination of whether the requirements of Tenn. R. Civ. P. 56 have been met. *Eadie v. Complete Co., Inc.*, 142 S.W.3d 288, 291 (Tenn. 2004); *Blair v. West Town Mall*, 130 S.W.3d 761, 763 (Tenn. 2004); *Staples v. CBL & Assoc.*, 15 S.W.3d 83, 88 (Tenn. 2000)

The requirements for the grant of summary judgment are that the filings supporting the motion show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002); *Blair*, 130 S.W.3d at 764; *Byrd v. Hall*, 847 S.W.2d 208, 210 (Tenn. 1993). Consequently, summary judgment should be granted only when the undisputed facts, and the inferences reasonably drawn from the undisputed facts, support one conclusion - that the party seeking the summary judgment is entitled to a judgment as a matter of law. *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269 (Tenn. 2001); *Brown v. Birman Managed Care, Inc.*, 42 S.W.3d 62, 66 (Tenn. 2001); *Staples*, 15 S.W.3d at 88.

In our review, we must consider the evidence presented at the summary judgment stage in the light most favorable to the non-moving party, and we must afford that party all reasonable inferences. *Doe v. HCA Health Servs., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001); *Memphis Hous. Auth. v. Thompson*, 38 S.W.3d 504, 507 (Tenn. 2001). We must determine first whether factual disputes exist and, if so, whether the disputed fact is material to the claim or defense upon which the summary judgment is predicated and whether the disputed fact creates a genuine issue for trial.

---

[5] The court again noted it had made the same finding in the *Buras* case.

*Byrd*, 847 S.W.2d at 214; *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998). "If there is a dispute as to any material fact or any doubt as to the conclusions to be drawn from that fact, the motion must be denied." *Byrd*, 847 S.W.2d at 211.

To meet the requirements for summary judgment, a party moving for summary judgment must, in its filings supporting the motion, either affirmatively negate an essential element of the non-moving party's claim or conclusively establish an affirmative defense. *Blair,* 130 S.W.3d at 767; *Staples*, 105 S.W.3d at 88-89. If the moving party fails to meet this burden, the burden to come forward with probative evidence establishing the existence of a genuine issue for trial does not shift to the non-moving party and the motion must be denied. *Staples*, 105 S.W.3d at 88-89.

If, however, the moving party successfully negates a claimed basis for the action or establishes an affirmative defense, the non-moving party may not simply rest upon the pleadings. *Staples*, 15 S.W.3d at 88-89. In that situation, the nonmoving party has the burden of pointing out, rehabilitating, or providing new evidence to create a factual dispute as to the material element in dispute. *Staples*, 15 S.W.3d at 88-89; *Rains v. Bend of the River*, 124 S.W.3d 580, 587-88 (Tenn. Ct. App. 2003). Thus, if, but only if, the moving party presents uncontested evidence sufficient to justify grant of the motion, the nonmoving party is required to come forward with probative evidence which makes it necessary to resolve a factual dispute at trial. *Blair*, 130 S.W.3d at 767. A nonmoving party who fails to carry that burden faces summary dismissal of the challenged claim.

In this case, many of the issues turn on the interpretation of the written agreement between the parties. The proper interpretation of a contract is a question of law. *Guiliano,* 995 S.W.2d at 95. Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. *Id.*; *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). This court must review the document ourselves and make our own determination regarding its meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993). That review is governed by well-settled principles of contract interpretation.

"The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern." *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The purpose of interpreting a written contract is to ascertain and give effect to the contracting parties' intentions, and where the parties have reduced their agreement to writing, their intentions are reflected in the contract itself. *Id.*; *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999). "The intent of the parties is presumed to be that specifically expressed in the body of the contract . . . ." *Planters Gin Co.*, 78 S.W.3d at 890. Therefore, the court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975). Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. *Planters Gin Co.*, 78 S.W.3d at 890.

Thus, courts defer to the contracting process by enforcing written contracts, which establish the rights and obligations of the parties, according to their plain terms without favoring either contracting party. *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985); *Hardeman County Bank v. Stallings*, 917 S.W.2d 695, 699 (Tenn. Ct. App. 1995). Courts must avoid rewriting an agreement under the guise of interpreting it. *Marshall v. Jackson & Jones Oil, Inc.*, 20 S.W.3d 678, 682 (Tenn. Ct. App. 1998). The courts will not make a new contract for parties who have spoken for themselves, *Petty v. Sloan*, 197 Tenn. 630, 640, 277 S.W.2d 355, 359 (1955), and will not relieve parties of their contractual obligations simply because these obligations later prove to be burdensome or unwise. *Boyd v. Comdata Network, Inc.*, 88 S.W.3d 203, 223 (Tenn. Ct. App. 2002).

## IV. ISSUES ON APPEAL

On appeal AMG argues that the agreement is enforceable because it is supported by ample consideration. AMG further argues that since the agreement is enforceable and Ms. Chandler breached it, it is entitled to damages. AMG asserts, first, that the liquidated damages provision is enforceable because it is a reasonable estimate of damages. It argues, in the alternative, that if the liquidated damages provision is unenforceable, it is entitled to recover its actual damages which it proved to be $22,400.

On the other side, Ms. Chandler argues that the loan agreement is not enforceable because under its terms, AMG was not bound to employ Ms. Chandler for a specific term or at all, and, therefore, mutuality was lacking. She also argues that the contract is unenforceable because it unreasonably restrains trade. This argument is based on the proposition that the liquidated damages provision effectively prevents those who have taken advantage of the loan program (and reaped its benefits by attaining CRNA status) from seeking employment other than at AMG (which, of course, they agreed to as a condition of the loans). Ms. Chandler also argues the Loan Agreement is not enforceable because it is unconscionable. As to the liquidated damages provision, she argues that the $15,000 additional payment is an unenforceable penalty. She also asserts the trial court correctly found AMG had suffered no damages and that AMG was not entitled to actual damages if its liquidated damages provision were set aside.

## V. ENFORCEABLE AGREEMENT

Although Ms. Chandler's nonenforceability arguments speak in terms of the Loan Agreement, they are actually directed to only one aspect of that agreement, the employment commitment. She does not challenge the portions of the agreement providing for the loan of monies for tuition, the conditions associated with the loan, or the obligation to repay it with interest.[6]

---

[6]Although she did at one point challenge the interest rate as usurious.

This attempt to separate the obligations and benefits of the agreement disregards the purpose of the arrangement. AMG is not a lending institution and does not operate its tuition loan program for any purpose other than to recruit CRNAs in a highly-competitive market. AMG offers loans to qualified students solely as a means to attract qualified personnel to staff the operating rooms in the hospitals it services. The agreement must be viewed in its entirety, and not as separate, unrelated sets of promises. As a whole, the agreement provides benefits and obligations to both parties, and its enforceability must be measured based on the entire agreement.

As mentioned earlier, both the trial court and this court considered the same contract that is at issue in this case in another case, *Anesthesia Medical Group v. Buras*, 2006 WL 2737829. This court examined the enforceability of the AMG Loan Agreement in light of some of the same arguments made herein by Ms. Chandler and determined that it was enforceable. We find no basis for a different conclusion in this case. In *Buras*, we stated:

> Mr. Buras argues, however, that we cannot consider the contract at issue to be an employment contract, because it does not obligate AMG to hire him at the conclusion of his training and it permits AMG to terminate his employment at any time without cause upon thirty days notice. He thus claims that he was an at-will employee with the right to quit his job at any time without penalty.
>
> When we examine Mr. Buras's arguments closely, he is actually suggesting that there was no consideration for his promise to work for AMG for three years, because there was no corresponding unconditional promise by AMG to employ him for that period of time. It is axiomatic that adequate consideration is necessary for the validity of any contract, *Dobbs v. Guenther,* 846 S.W.2d 270, 276 (Tenn. Ct. App. 1992). *Price v. Mercury Supply Co., Inc.,* 682 S.W.2d 924, 933 (Tenn. Ct. App. 1984). Conversely, a promise unsupported by consideration is unenforceable, and is characterized as a mere *nudum pactum. Williams v. Maremont Corp.*, 776 S.W.2d 78, 80 (Tenn. Ct. App. 1988); *Helton v. Reynolds,* 640 S.W.2d 5, 9 (Tenn. Ct. App. 1982).
>
> We note, however, that "[t]he fact that an agreement is optional as to one of the parties, and obligatory as to the other, does not destroy its mutuality. If there is sufficient consideration on both sides, it is mutual." *Jeffers v. Hawn*, 212 S.W.2d 368, 370 (Tenn. 1948)(quoting *Cherry v. Smith*, 22 Tenn 19, 24 (1842)). *See also Dobbs v. Guenther,* 846 S.W.2d 270, 276 (Tenn. Ct. App. 1992). Consideration can be in the form of either a benefit to the party making the promise, or a detriment to the party to whom the promise is made. *Galleria Associates, L.P. v. Mogk*, 34 S.W.3d 874, 876 (Tenn. Ct. App. 2000); *Calabro v. Calabro*, 15 S.W.3d 873, 876 (Tenn. Ct. App. 1999).
>
> The advancement of tuition money in the form of a loan is only part of the consideration that AMG promised for the services of Mr. Buras after his certification.

AMG agreed to forgive repayment of the loan if Mr. Buras completed his three years of employment. Forgiveness of the loan under specified circumstances constitutes both a benefit to Mr. Buras and a detriment to AMG, and it amounts to additional valid consideration. It is true that if AMG had decided not to hire Mr. Buras after he completed his training, it would not have been exposed to any legal liability for breach of contract. It would, however, have lost its right to repayment of the money it invested, pursuant to a provision in the contract that reads, "In the event that upon graduation AMG does not wish to employ student, AMG will not expect any reimbursement for educational fees paid to Student and the Promissory Note will be cancelled." Of course, if Mr. Buras had completed three years employment with AMG as agreed, that would also have served to cancel his repayment obligation.

It appears to us that the agreement in dispute has been carefully crafted to balance the obligations of the parties to each other under a wide variety of possible circumstances. It must be viewed in its entirety, not as separate, unrelated sets of promises. When so viewed, it is clear there were mutual obligations and considerations. Both parties obtained benefits and both gave consideration. It was an arrangement for an education loan with subsequent employment. Mr. Buras obtained a loan that allowed him to become trained and certified in an area with high demand and apparently lucrative salaries. AMG expected to obtain Mr. Buras's services as a CRNA for three years and could plan its other hiring and recruitment efforts accordingly. The Agreement is enforceable, and the non-breaching party is entitled to damages.

*Anesthesia Medical Group v. Buras*, 2006 WL 2737829, at * 8-9 (some citations deleted).

For the same reasons, we find that the agreement at issue herein represents an arrangement between the parties involving several sets of mutual benefits and obligations and is supported by consideration.

The fact that the agreement did not absolutely obligate AMG to hire Ms. Chandler after her graduation does not destroy the mutuality of obligation or negate the presence of consideration. If Ms. Chandler had graduated and was prepared to start work for AMG, AMG would be obligated to either put her to work or to forgive repayment of the tuition payments it had advanced her. Consideration exists when a party either does something he is under no legal obligation to do or refrains from doing something he has a legal right to do. *Sutton v. First Nat'l Bank of Crossville*, 620 S.W.2d 526, 531 (Tenn. Ct. App. 1981). In return for her promise to work for AMG for three years, Ms. Chandler received a promise that, if AMG did not employ her, it would forgive repayment of the tuition loans. Such a promise constitutes consideration.

Ms. Chandler's other arguments challenging the enforceability of the agreement are based on allegations the agreement includes a restrictive employment covenant that is unreasonable and not supported by adequate consideration and is an unreasonable restraint of trade. These arguments

are based on the allegation that the liquidated damages provision effectively prevents borrowers from seeking other employment.

We are, however, unconvinced as to this basic premise. Ms. Chandler has failed to demonstrate that the liquidated damages provision is the equivalent of a covenant not to compete or is otherwise a restraint of trade. The Agreement clearly makes the additional payment contingent upon specified events of default, and parties are free to agree to such provisions. The enforceability of the liquidated damages provision is properly determined by the analysis applicable to such provisions, as discussed below.

It is undisputed that Ms. Chandler failed to fulfill her obligation to go to work for AMG after graduation. As a general rule of law, a party who breaches a contract will be held liable for any damages to the non-breaching party caused by the breach. Compensatory damages are intended to compensate the wronged party for the loss or injury caused by the wrongdoer's conduct. *Beaty v. McGraw*, 15 S.W.3d 819, 828-29 (Tenn. Ct. App. 1998). The purpose of damages in a breach of contract case is to place the injured party, as nearly as possible, in the same position it would have been in had the contract been performed. *Lamons v. Chamberlain*, 909 S.W.2d 795, 801 (Tenn. Ct. App. 1993); *Hennessee v. Wood Group Enters., Inc.,* 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991); *Wilhite v. Brownsville Concrete Co.,* 798 S.W.2d 772, 775 (Tenn. Ct. App.1990).

## VI. LIQUIDATED DAMAGES

AMG argues on appeal that the trial court should have enforced the liquidated damages provision of its contract instead of declaring it an impermissible penalty.

Two important interests are at stake in a liquidated damages question: the freedom of parties to bargain for and agree upon terms in a contract and the limitations set by public policy.[7] *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 100 (Tenn. 1999). Tennessee courts have long recognized the freedom of parties to agree upon terms that may not appear desirable to outsiders and the duty of the courts to refrain from interfering with the parties' agreement unless to enforce it would violate established public policy.[8] *Id.*

---

[7]Liquidated damages provisions are subject to close scrutiny because of the public policy against forfeitures. *Kimbrough & Co. v. Schmitt*, 939 S.W.2d at 108; *Harmon v. Eggers*, 699 S.W.2d at 163.

[8]In general, competent parties are free to bargain for and agree to contract terms, and the courts will not concern themselves with the wisdom or folly of such contracts, but will enforce them in accordance with the intentions of the parties. *Chapman v. Chapman Drug Co.*, 341 S.W.2d 392, 398 (Tenn. 1960).

In *Guiliano*, the Tennessee Supreme Court rejected the "retrospective approach"[9] for analyzing liquidated damages provisions and, instead, adopted the "prospective approach" largely because that approach gave greater consideration to the rights of parties to establish their own terms in a contract. *Id.*

As the Court noted, parties are free to agree to liquidated damages, and courts should presume that when parties have done so, they chose the certainty and efficiency provided by the inclusion of such a term in their agreement over the uncertainty and burden of requiring the non-breaching party to prove actual damages in the event of a default. In rejecting the retrospective approach, the Court stated:

> We find it is unfair to require the non-breaching party to prove actual damages in cases where the parties agreed in advance to a liquidated damages provision. Such a requirement ignores the original intentions of the parties and defeats the purposes of stipulating in advance to potential damages.

*Guiliano*, 995 S.W.2d at 100.

One important result of the choice of the prospective approach is that the focus of the court's inquiry must be the estimation of potential damages and the circumstances existing at the time of contract formation. *Id.,* 995 S.W.2d at 98-99. "Under this approach, the amount of actual damages at the time of breach is of little or no significance to the recovery of liquidated damages."[10] *Id.* at 99. We note that in *Guiliano*, there were no actual damages because the employee whose employment was terminated in breach of the contract had obtained another job at a higher salary. However, the Supreme Court enforced the liquidated damages provision because at the time of contract formation, it was a reasonable estimate (one year's salary) of the damages the employee could sustain.

---

[9] The Court cited as examples Tennessee cases where the retrospective approach had been used, *Eller Bros., Inc. v. Home Fed. Sav. & Loan Assoc.*, 623 S.W.2d 624, 628 (Tenn. Ct. App. 1981); *Harmon v. Eggers*, 699 S.W.2d 159 (Tenn. Ct. App. 1985); *Beasley v. Horrell*, 864 S.W.2d 45, 50 (Tenn. Ct. App. 1993); and *Kimbrough & Co. v. Schmitt*, 939 S.W.2d 105,108 (Tenn. Ct. App. 1996), and noted that to the extent the Court of Appeals had adopted a retrospective approach, that approach was overruled. *Guiliano*, 995 S.W.2d at 99-100. The Court described that approach as applied by the Court of Appeals as including both a prospective review of the circumstances at the time of contract formation and a review of actual damages at the time of breach. *Id*. at 99. To the extent *Guiliano* overruled not only the retrospective approach but also the reasoning used in that approach, these cases are of questionable relevance.

[10] Under the rejected "retrospective approach," however, the actual damages at the time of breach remain relevant in determining whether the original estimation was reasonable. *Id*. For example, if the liquidated sum greatly exceeds the actual damages, courts that follow the "retrospective approach" will treat the liquidated sum as a penalty and limit recovery to actual damages. *Id.*, at 99.

-11-

*Guiliano* did not change the essential requirements of a valid and enforceable liquidated damages provision. Instead, it clarified the viewpoint from which courts are to analyze those requirements. The law continues to be that a liquidated damages provision will be upheld if the amount of such damages bears a reasonable relationship to the amount of actual damages that would likely be sustained in the event of a breach and if the actual amount of damages would be difficult to determine or prove. Conversely, liquidated damages will not be upheld if they are deemed to constitute a penalty against the breaching party rather than a reasonable way to guarantee compensation for damages to the non-breaching party. *Guiliano,* 995 S.W.2d at 98.

Both requirements must be judged as of the time of the contract formation. At that time, the parties are making a projection or estimation of the amount of damages the non-breaching party will incur in the event of default.

> If the liquidated sum is a reasonable prediction of potential damages and the damages are indeterminable or difficult to ascertain **at the time of contract formation**, then courts following the prospective approach will generally enforce the liquidated damages provision.

*Id*., 995 S.W.2d at 99 (emphasis added).

Based on these principles, this court found enforcement of the liquidated damages provision of the contract in the *Buras* case to be appropriate because it was a reasonable prediction of the actual damages AMG would suffer if one of its CRNAs resigned his or her position after beginning work but before completion of the three year commitment. The proof in that case showed that if an immediate permanent replacement could not be found, AMG would have to pay for the services of a *locum tenens* at a rate substantially higher than for a salaried CRNA. Although it could not be predicted with accuracy how long it would take AMG to find a permanent replacement, a representative of the practice group testified that on average it took three months to replace one salaried CRNA with another. AMG might also have to pay a finder's fees for a permanent replacement depending on whether or not the placement was through an agency. There was testimony about the amount that could be expected to be paid in both categories. It was therefore foreseeable that AMG would suffer monetary damages stemming from the cost of finding a replacement. In *Buras*, the proof at trial showed that the $15,000 liquidated damages was a reasonable estimate of the damages AMG would suffer from a breach in the circumstances presented in that case.

Unlike *Buras*, the case before us was decided on cross motions for summary judgment, not after an evidentiary hearing. Consequently, the question before us is whether there is undisputed evidence in the record that establishes that, at the time the parties entered into the contract, the amount of the liquidated damages was a reasonable prediction of potential damages AMG would suffer if Ms. Chandler breached her employment commitment and whether the exact amount of such potential damages was indeterminable or difficult to ascertain.

We have reviewed the record looking for proof that when the Loan Agreement was signed (1) it was reasonably anticipated that AMG would incur damages if Ms. Chandler failed to live up to her employment commitment by failing to come to work after graduation if she gave AMG seven months notice; (2) it would have been difficult to ascertain the amount of any such potential damages; and (3) that $15,000 was a reasonable estimate of those damages. The damage AMG would suffer would arise from costs it would incur, over and above the salary it would have paid to Ms. Chandler, to hire a permanent replacement for her and to obtain temporary help through *locum tenens* until a permanent replacement was hired.[11]

The record includes an affidavit from AMG's human resources director, Diana Bird, which provided in part:

> For the past seven years, there has been a serious shortage and a high demand for CRNAs. When a student breaks an employment commitment to AMG, AMG incurs significant expenses in hiring a replacement because of the CRNA shortage and the fact that AMG only plans to start new CRNA employees when the CRNA students graduate from a nurse anesthetist program.

According to that affidavit, the education requirement is a two year program that begins and ends in the fall. Ms. Chandler describes the training program she went through at Middle Tennessee School of Anesthesia as a comprehensive fill-time course of study lasting more than two years. She attended the program full-time from August 1998 to November 2001. Her May 2001 letter to AMG was sent seven months before she was scheduled to graduate.

In its July 19, 2001 letter to Ms. Chandler, responding to her request that the "liquidation fee" be waived, AMG stated:

> The Finance Committee is not making exceptions on liquidation fees, especially when students default in the same year in which they graduate. The number of students we sponsor is planned ahead of time and students asking for sponsorship are turned down once the appropriate number of students is determined. We then lose out on those individuals, as they make plans to go other places during their time in the program.

These statements imply, but do not clearly establish, that AMG would necessarily sustain damages if a student, before graduation, declined to accept employment at AMG. While they may show that AMG would incur the kind of costs described above if an employed, sponsored CRNA left employment, they do not explain how AMG will necessarily incur those costs when given more than six months' notice that a sponsored student will not be coming to work for them as anticipated.

---

[11] These are the elements of actual damages claimed by AMG.

Interestingly, there are other situations that result in a sponsored student never coming to work for AMG that do not trigger the liquidated damages provision, although the student is obligated to repay the loan with interest. Those include dismissal of the student from the training program; discontinuance of the training program by the student and failure to re-enroll at the earliest opportunity; and failure of the student to apply for, take, and pass the certification examination within two years after graduation.[12]

Ms. Chandler asserts that by giving AMG seven months notice before her graduation, she gave AMG sufficient time to find a replacement for her before her anticipated start date.[13] Because our analysis must focus on the situation at the time of contract formation, we interpret this argument as asserting that it was not foreseeable at the time the parties entered into the contract that AMG would necessarily sustain damages if a student failed to become an AMG employee but notified AMG of that fact prior to graduation and prior to specific employment arrangements being made.

Based on the record before us, we cannot conclude that AMG has shown there are no material undisputed facts and that it is entitled to judgment as a matter of law as to the enforceability of the liquidated damages provision. On the other hand, we also conclude that Ms. Chandler has also failed to show that she is entitled to summary judgment on the issue of liquidated damages. She has failed to negate an essential element of AMG's claim. The purpose of summary judgment "is to resolve controlling issues of law rather than to find facts or resolve disputed factual issues." *Draper v. Westerfield*, 181 S.W.3d 283, 288 (Tenn. 2005), *quoting XI Props., Inc. v. Race Trac Petroleum, Inc.*, 151 S.W.3d 443, 446 (Tenn. 2004).

---

[12]Asked about this feature of the contract at oral argument, AMG's attorney acknowledged that one purpose of the $15,000 fee was to keep CRNA graduates from competing with AMG by working for someone else.

[13]It its statement of undisputed facts, AMG asked Ms. Chandler to admit or deny:

Because of the lack of available CRNAs, AMG had to utilize the service of a locum tenens nurse anesthetist in Defendant's position until a permanent replacement could be found. AMG was not able to obtain such a replacement until January 21, 2002.

Ms. Chandler denied this statement and explained that she had sought discovery on this issue, but AMG had declined to provide documents or other information to document this statement. Ms. Chandler similarly denied statements that the *locum tenens* was more expensive than Ms. Chandler would have been and that AMG had been required to use a *locum tenens* for nine weeks, resulting in expenses of $22,413.87 due to Ms. Chandler's failure to come to work after her graduation. In response, Ms. Chandler stated:

During the course of discovery, Ms. Chandler asked AMG to produce documents and information with which she could prove: (1) AMG did not rely on Ms. Chandler coming to work for them after her graduation; (2) that AMG did not really "need" to hire the locum tenens CRNA claims it did; and (3) that AMG failed to mitigate its damages when it hired the specific locum tenens it claims it had to.

Of course, this evidence goes primarily to actual damages. Whether or not AMG sustained actual damages from Ms. Chandler's breach, and the amount of any such damages, are of little or no relevance to the validity of the liquidated damages provision. *Guiliano*, 995 S.W.2d at 99.

## VI.

We find that the Loan Agreement is enforceable, including the commitment of the student to work for AMG for three years after graduation. We also find that Ms. Chandler breached the agreement by refusing to go to work for AMG. As to whether the liquidated damages provision is enforceable, we find neither party has met the requirements for summary judgment and, accordingly, affirm the trial court's denial of summary judgment to AMG and reverse the trial court's grant of summary judgment to Ms. Chandler. Having found that summary judgment is not warranted at this time, we remand the case to the trial court for further proceedings. We also reverse the trial court's finding at this stage that AMG failed to prove actual damages and find that facts material to that issue are disputed. Consequently, the issue of entitlement to and amount of actual damages, if any, also remains to be resolved, depending on the resolution of the liquidated damages issue.

The costs on appeal are taxed equally between the appellant, Anesthesia Medical Group, and the appellee, Pamela Greer Chandler.

_____
PATRICIA J. COTTRELL, JUDGE